163 Cal.App.4th 1314 (2008)
In re RED LIGHT PHOTO ENFORCEMENT CASES.
No. D048882.
Court of Appeals of California, Fourth District, Division One.
June 13, 2008.
*1318 Lerach Coughlin Stoia Geller Rudman & Robbins, Coughlin Stoia Geller Rudman & Robbins, Timothy G. Blood, Pamela M. Parker and Kevin K. Green for Plaintiffs and Appellants C.L. Trustees, Patricia Yates, Christine Stankus, Mark Glickman, Christine Ballon, Heather Buys, Jerrold Cook and Richard Yells.
Sullivan, Hill, Lewin, Rez & Engel and Brian L. Burchett for Plaintiffs and Appellants Mark Glickman, Christine Ballon and Heather Buys.
Wingert Grebing Brubaker & Goodwin, Charles R. Grebing, Eric R. Deitz; Michael Fremont Law Office and Michael J. Fremont for Plaintiffs and Appellants Jerrold Cook and Richard Yells.
Eugene G. Iredale, Douglas S. Gilliland; Law Offices of Arthur F. Tait III & Associates and Arthur F. Tait III for Plaintiffs and Appellants C.L. Trustees, Patricia Yates and Christine Stankus.
Trutanich  Michel, C. D. Michel, Glenn S. McRoberts and Thomas E. Maciejewski for Plaintiffs and Appellants Michel T. Leonte and Richard H. Best.
Ingerson & Associates and Gregory M. Ingerson for Farid Fatoorechi as Amicus Curiae on behalf of Plaintiffs and Appellants.
O'Melveny & Myers, B. Boyd Hight, James P. Jenal, James P. Kidder; McKenna Long & Aldridge, Robert J. Lauchlan, Jr., Ross H. Hyslop and Jim
*1319 McNeill for Defendants and Respondents ACS State and Local Solutions, Inc., Affiliated Computer Services, Inc., and PRWT.
Jenkins & Hogin, Michael Jenkins, Gregg Kovacevich and John C. Cotti for Defendant and Respondent City of West Hollywood.
Dennis J. Herrera, City Attorney (San Francisco), Burk E. Delventhal and Vince Chhabria, Deputy City Attorneys, for League of California Cities and City and County of San Francisco as Amici Curiae on behalf of Defendants and Respondents.

OPINION
McCONNELL, P. J.
In 1995 the Legislature added section 21455.5 to the Vehicle Code, which authorizes municipalities to enforce red light violations through the use of automated traffic enforcement systems. (Veh. Code, § 21455.5, subd. (a).) Plaintiff in one of five coordinated cases that challenged the systems contends the trial court erred by granting the defendant city's motion for summary judgment on the ground that as a matter of law his taxpayer waste cause of action and petition for writ of mandate lack merit.[1] We find no error, as red light photo enforcement is not wasteful or illegal, and the city has no duty to grant the type of writ relief sought, e.g., the overturning of drivers' convictions for running red lights and the refund of their fines and bail forfeitures.
Plaintiffs in the other cases contend the court erred by finding after a bench trial that contingency fee contracts municipalities entered into with private contractors for support services for the automated traffic enforcement systems were not void as against public policy. We agree with the court's assessment that the legal opinions on which plaintiffs rely are distinguishable, and the contracts did not "`tend[] ... to prevent or impede the due course of justice'" (Wilhelm v. Rush (1937) 18 Cal.App.2d 366, 370 [63 P.2d 1158] (Wilhelm)), as the municipalities retained control over the systems and the prosecutorial function. We affirm the judgment for defendants.

*1320 FACTUAL AND PROCEDURAL BACKGROUND

1. Contracts

Numerous cities entered into contracts with private contractors, including Lockheed Martin IMS and its successors in interest, Affiliated Computer Services, Inc., and ACS State and Local Solutions (collectively ACS), to provide support services for the operation of automated traffic enforcement systems. ACS's systems use inductive sensor loops imbedded in the pavement of intersections, which when driven over send signals to cameras mounted on poles. "For a violation to be recorded, three conditions must be satisfiedfirst, that the traffic signal display facing the motorist is red; second, that the pre-determined delay or grace time (for example, 0.3 seconds) has expired; and third, that the vehicle speed crossing from the first loop to the second loop is greater tha[n] a pre-determined minimum speed threshold (for example, 12 or 15 mph)."
ACS's services under the contracts included assisting cities in selecting intersections to monitor; installing, maintaining and servicing equipment; collecting and processing film; reviewing film images twice and determining whether they met cities' screening criteria for the issuance of citations, and if so, obtaining information on vehicle owners from the Department of Motor Vehicles (DMV); electronically transmitting records to the cities' police departments for approval or disapproval of the issuance of citations; mailing approved citations to offenders; communicating with the public, and providing expert testimony in contested cases on the technical aspects of red light photo enforcement.
The contracts had one of three fee arrangements: a fixed monthly amount, fees contingent on the number of citations paid per month, and a hybrid of fixed and contingency fees. The contingency fees were of varying amounts per citation, such as $60 or $70.

2. Lawsuits

This case involves five actions challenging the legality of the contingency fee contracts, which were coordinated and assigned to the San Diego County Superior Court. Among plaintiffs' theories is that the contingency fee contracts were against public policy and void because they raised inherent conflicts of interest and had the potential to cause corruption. Plaintiffs do not challenge the use of automated traffic enforcement systems per se, the accuracy of the systems or the fixed rate contracts. The operative complaints are as follows.
In June 2001 Mark Glickman and Christine Ballon filed a first amended complaint against the City of San Diego and ACS for declaratory and *1321 injunctive relief and unjust enrichment, and in a representative capacity against ACS for violation of California's unfair competition law (UCL; Bus. & Prof. Code, § 17200) (Glickman action). The complaint alleged Glickman and Ballon were cited for running red lights, Glickman forfeited a $271 bail and attended traffic school, after which the City of San Diego dismissed the charge, and Ballon pleaded guilty to the offense and paid a $271 fine.
In December 2001 C.L. Trustees, a family trust, Patricia Yates and Ben Coleman filed a first amended complaint against ACS as a proposed class action (C.L. Trustees action). The complaint contained causes of action for violation of the UCL, unjust enrichment, and money had and received.
In October 2002 Jerrold Cook and Richard Mark Yells filed a third amended complaint, also a proposed class action, against the City of San Diego and other governmental parties and ACS (Cook action). The complaint included a cause of action against ACS for violation of the UCL, and causes of action against all defendants for unjust enrichment, and declaratory and injunctive relief.
In May 2005 Heather Buys filed a second amended complaint against the City and County of San Francisco and other governmental parties and ACS for declaratory and injunctive relief, unjust enrichment and constructive trust, and in a representative capacity against ACS for violation of the UCL (Buys action).[2] The second amended complaint also included a petition for writ of mandate.
In June 2005 Michael Leonte and Richard Best filed a third amended complaint against the City of West Hollywood, arising out of its contract with ACS, for injunctive and declaratory relief, unjust enrichment and the imposition of a constructive trust, and taxpayer waste under Code of Civil Procedure section 526a (Leonte action). Plaintiffs also petitioned for a writ of mandate.[3]
*1322 The complaints generally prayed for an order declaring the automated traffic enforcement systems and citations issued thereunder illegal, and cessation of red light photo enforcement; an order requiring the public defendants to cause the convictions of red light runners to be overturned, and notification of that action to the DMV; and the refund of all fines and bail forfeitures.

3. Class Designations

Plaintiffs in the C.L. Trustees and Cook actions successfully moved for class certification. The class in C.L. Trustees consisted of "`all persons in the State of California who paid fines, penalties or attorneys' fees as a result of a citation issued through defendants' automated traffic enforcement systems in California.'" The class in Cook consisted of "`all persons who paid a fine and/or assessment or forfeited bail as a result of receiving a citation for a red light violation captured by an automatic enforcement system in the City of San Diego between September 1998 and June 2001.'"

4. Summary Judgment Proceedings

In 2003 the parties in the Glickman, C.L. Trustees and Cook actions filed cross-motions for summary judgment, or alternatively, summary adjudication. The court denied the summary judgment motions, finding triable issues of material fact concerning the contingency fee contracts. The court granted defendants' summary adjudication motion on causes of action not at issue on appeal.
In 2005 the parties in the Leonte action filed cross-motions for summary judgment or summary adjudication. The court granted ACS's motion for summary judgment, ruling that Leonte and Best lack standing to pursue their action because neither of them received a red light citation, and Leonte neither lived nor owned property in the City of West Hollywood. The court also found Best lacks standing to bring a taxpayer waste cause of action because "plaintiffs do not claim that [the c]ity's red[-]light camera photo enforcement system operates at a loss, i.e., is wasteful. Further, the expenditure... of public funds on the ... [c]ity's red-light camera photo enforcement system is not illegal since Vehicle Code [section] 21455.5 contemplates the use of public funds to operate the system."

*1323 5. Motion in Limine and Dismissal of Municipalities

Trial of the Glickman, C.L. Trustees, Cook and Buys actions was held over 11 days in February and March 2006. Before trial, the public and private entity defendants jointly filed a motion in limine to exclude evidence or argument pertaining to the setting aside of criminal penalties imposed on plaintiffs for running red lights. Defendants argued that under California law, a criminal defendant may not bring a civil action to challenge a conviction without first showing the rendering court has overturned the conviction. The motion stated the named plaintiffs "either pleaded guilty to their Vehicle Code violations or contested the charges unsuccessfully, and they have not petitioned [to] the rendering court to vacate their penalties. Yet, [p]laintiffs bring these civil lawsuits seeking a refund of the fines paid in connection with their convictions. And they do not only seek to set aside their own criminal penalties; they seek to do so for everyone else as well."
The court granted the motion and prohibited plaintiffs "from arguing at trial that they are entitled to a refund of the fines that they paid." The court noted plaintiffs "have not shown that their convictions were vacated and set aside by the [rendering] court," and they "have not cited any California case law that allows ... plaintiffs to move to set aside the criminal penalties ... without first vacating the underlying criminal conviction."
Plaintiffs who had named governmental defendants in their actions (Glickman, Cook and Buys actions) dismissed those parties, based on the court's ruling on defendants' motion in limine. Further, the Legislature had amended the Vehicle Code to prohibit, as of January 1, 2004, contingency fee agreements for automated traffic enforcement systems (Stats. 2003, ch. 511, § 1; Veh. Code, § 21455.5, subd. (g)(1)), and the municipalities no longer had any such contracts. Thus, plaintiffs agreed their equitable claims for injunctive relief were moot.[4]
Thus, the only remaining issue was plaintiffs' right to restitution under the UCL from ACS. Plaintiffs argued restitution was proper because "any contract under which a witness is offered compensation contingent on the success of the litigation is void," and "any contract under which one party procures evidence and is compensated contingent on the success of the litigation is void."
*1324 ACS argued the court's ruling on the motion in limine also disposed of plaintiffs' claims against it. Plaintiffs countered that the ruling did not apply to ACS, as ACS obtained fees from the municipalities, rather than criminal penalties. The court found the case remained viable as to ACS and proceeded to trial, where the parties presented numerous witnesses. Although plaintiffs argued the contracts were void on their faces, and they were not required to prove actual bias, their evidence largely pertained to ACS's actual performance of the contracts and purported bias.

6. Trial Court's Ruling

In an April 2006 order the court determined the contingency fee contracts were valid and not void as against public policy because (1) ACS neither acted as a prosecutor nor provided witnesses to "opine on an element of the charge against any citee, such as guilt," and rather, it agreed to provide witnesses to testify only about how the red light camera enforcement systems worked; (2) each contract reserved to the municipality the right to control critical aspects of the systems, such as the location of cameras, the timing of photo taking, the criteria ACS used to review and submit photos to the municipalities, secondary review of the photos, and the decision on whether to issue a citation; (3) there was no evidence the municipalities had unequal bargaining power "in the negotiation and the placement and pricing of the service"; and (4) there was no evidence the number of citations issued under the contingency fee and flat fee contracts differed. On June 9, 2006, the court entered judgment for ACS in each of the five actions.

DISCUSSION

I

Appeal in Leonte Action

A

Taxpayer Waste Cause of Action
Code of Civil Procedure section 526a provides in part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a [local agency] may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."
*1325 (1) The purpose of Code of Civil Procedure section 526a "is to permit a large body of persons to challenge wasteful government action that otherwise would go unchallenged because of the standing requirement." (Waste Management of Alameda County, Inc. v. County of Alameda (2000) 79 Cal.App.4th 1223, 1240 [94 Cal.Rptr.2d 740].) "The essence of a taxpayer action is an illegal or wasteful expenditure of public funds or damage to public property. It must involve an actual or threatened expenditure of public funds. General allegations, innuendo, and legal conclusions are not sufficient; rather, the plaintiff must cite specific facts and reasons for a belief that some illegal expenditure or injury to the public fisc is occurring or will occur." (4 Witkin, Cal. Procedure (2007 supp.) Pleading, § 144, pp. 58-59.)
Plaintiff Leonte concedes he lacks standing to pursue a taxpayer waste cause of action against the City of West Hollywood. Plaintiff Best, who is a taxpayer in the City of West Hollywood, contends summary judgment was improper as to him because it was based on the court's erroneous finding he lacks standing because he was not cited for running a red light in an intersection controlled by an automated traffic enforcement system. He relies on White v. Davis (1975) 13 Cal.3d 757, 764 [120 Cal.Rptr. 94, 533 P.2d 222], and Connerly v. State Personnel Bd. (2001) 92 Cal.App.4th 16, 29 [112 Cal.Rptr.2d 5], which explain that under Code of Civil Procedure section 526a the taxpayer is not required to show special damages.
The court's ruling does not expressly state Best lacked standing to pursue a taxpayer waste cause of action because he was not cited for running a red light, but such a finding may reasonably be inferred. The ruling, however, was also based on findings that the City of West Hollywood's expenditures on the red light program were not wasteful, as there was no evidence the program lost funds, and were not illegal, as Vehicle Code section 21455.5 expressly allows the use of public finds for the program. If the court's findings on those issues were correct, the citation issue is moot.
The third amended complaint in the Leonte action alleged the City of Hollywood had received approximately $8,812,439 from its automated traffic enforcement systems, and the systems were "considered a major revenue source." Best does not challenge the legality of the City of West Hollywood's expenditure of public funds on the systems per se, acknowledging the Legislature authorizes such expenditures in Vehicle Code section 21455.5. Instead, Best purports to challenge the manner in which the City of West Hollywood has contracted for and operated its systems, and he asserts that manner constitutes the wasteful and illegal expenditure of public funds.[5]
*1326 Best cites Wirin v. Parker (1957) 48 Cal.2d 890, 894 [313 P.2d 844], in which the court held "Code of Civil Procedure, section 526a, provides that plaintiff may maintain an action to restrain the expenditure of public funds for illegal purposes. It is immaterial that the amount of the illegal expenditures is small or that the illegal procedures actually permit a saving of tax funds. [Citations.] It is elementary that public officials must themselves obey the law." Best also cites Citizens for Uniform Laws v. County of Contra Costa (1991) 233 Cal.App.3d 1468, 1473 [285 Cal.Rptr. 456], in which the court held a taxpayer waste action will stand if "paid employees of a ... public entity have expended their time in performing acts prescribed by the challenged law."
Best notes he produced evidence the City of West Hollywood violated Vehicle Code section 21455.5, subdivision (b) by not issuing warning notices for the first 30 days after the installation of automated traffic enforcement systems in certain intersections. Any noncompliance with the grace period, however, did not pertain to the expenditure of public funds, a prerequisite of a taxpayer waste cause of action. Moreover, we disagree with Best's position that a public agency's noncompliance with any aspect of an authorized program gives rise to a taxpayer waste claim. As the City of West Hollywood points out, "[a]bsurd consequences would result if taxpayers could readily get the courts to enjoin governmental agencies from spending any money in connection with any project or program that might arguably involve a component that was inconsistent with the law."
Best also contends he produced evidence the City of West Hollywood's automated traffic enforcement systems used speedtraps in violation of Vehicle Code section 40801. That statute provides: "No peace officer or other person shall use a speed trap in arresting, or participating or assisting in the arrest of, any person for any alleged violation of this code nor shall any speed trap be used in securing evidence as to the speed of any vehicle for the purpose of an arrest or prosecution under this code." (Veh. Code, § 40801, italics added.) Vehicle Code section 40802, subdivision (a)(1) defines "speed trap" as a "particular section of a highway measured as to distance and with boundaries marked, designated, or otherwise determined in order that the speed of a vehicle may be calculated by securing the time it takes the vehicle to travel the known distance."
*1327 Best submitted evidence that the automated traffic enforcement systems measure the time it takes a vehicle to travel the distance between a pair of electromagnetic sensors in a traffic lane, and a computer system "performs a time and rate of speed calculation that provides information upon which the system relies in documenting alleged [red light] violations." Further, Best established that a "flash camera is mounted in a box on a pole at the intersection, across from the target area so that the camera can photograph the front of the target vehicle as it proceeds through the intersection," and the "camera location is fixed ..., and thus the [automated traffic enforcement system] must use the vehicle's speed to estimate when the vehicle will be in a position for the required photographs to be taken."
(2) The City of West Hollywood, however, established that it did not use evidence of vehicle speed gathered in conjunction with the red light systems to prosecute any speeding charges. Vehicle Code section 40803, subdivision (a) provides that "[n]o evidence as to the speed of a vehicle upon a highway shall be admitted in any court upon the trial of any person in any prosecution under this code upon a charge involving the speed of a vehicle when the evidence is based upon or obtained from or by the maintenance or use of a speedtrap." (Italics added.) Similarly, Vehicle Code section 40804, subdivision (a) provides that "[i]n any prosecution under this code upon a charge involving the speed of a vehicle, an officer or other person shall be incompetent as a witness if the testimony is based upon or obtained from or by the maintenance or use of a speed trap." Under their plain language, the speedtrap statutes do not apply to red light enforcement, which the Legislature has authorized through the use of automated systems.
Additionally, Best asserts the City of West Hollywood "infringed alleged violators' constitutional and statutory privacy rights." At the trial court, Best complained that the City of West Hollywood granted ACS access to confidential DMV information on the registered owners of photographed vehicles, including their home addresses. Best cited Vehicle Code section 1808.21, subdivision (a) under which "[a]ny residence address in any record of the [DMV] is confidential and shall not be disclosed to any person, except a court, law enforcement agency, or other governmental agency...." (Italics added.)
(3) Best's position lacks merit because private contractors are authorized to obtain the information directly from the DMV as an arm of law enforcement agencies in red light cases, and the information is used for legitimate purposes. Indeed, effective January 1, 2004, the Legislature amended the Vehicle Code to specifically allow governmental agencies to contract out aspects of the operation of their automated traffic enforcement systems that are not expressly reserved to the municipalities, and there is no express *1328 reservation for obtaining information from the DMV. (Veh. Code, §§ 21455.5, subd. (d), 21455.6, subd. (b)(1).) Private contractors may perform administrative and day-to-day functions. (Veh. Code, § 21455.5, subd. (c)(2), (d).)
Further, Vehicle Code section 21455.5, subdivision (e)(1) provides that DMV records "shall be confidential, and shall be made available only to governmental agencies and law enforcement agencies and only for the purposes of this article," and subdivision (e)(2) provides that "[c]onfidential information obtained from the [DMV] for the administration or enforcement of this article shall be held confidential, and may not be used for any other purpose." Also, subdivision (e)(3) requires the disposal of DMV records after six months, or until final disposition of a citation, whichever is first, and the records "shall be destroyed in a manner that will preserve the confidentiality of any person included in the record or information." Thus, the manner of obtaining DMV records does not give rise to a constitutional challenge couched in a taxpayer waste cause of action.
Lastly, Best asserts the contingency fee compensation structure was illegal. That structure, however, was abolished in January 1, 2004, before the court's ruling on the summary judgment motions in the Leonte action, when the Legislature amended Vehicle Code section 21455.5. Thus, there was no longer any actual or threatened expenditure of public funds on contingency fee contracts, or conduct to restrain in a taxpayer waste action. (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1086 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; Code Civ. Proc., § 526a.) In his taxpayer waste causes of action against ACS, Best prayed for "preliminary and permanent injunctive relief against [the city] to prevent [its] ongoing unlawful expenditure of public funds."
The trial court properly granted summary judgment for the City of West Hollywood in the Leonte action. A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A defendant satisfies this burden by showing "`one or more elements of' the `cause of action' in question `cannot be established,' or that `there is a complete defense'" to that cause of action. (Ibid.) In determining whether the moving party met its burden, we review the record de novo. (Rubenstein v. Rubenstein (2000) 81 Cal.App.4th 1131, 1143 [97 Cal.Rptr.2d 707].)
(4) A taxpayer waste cause of action will not lie where the challenged governmental action is legal. (Lucas v. Santa Maria Public Airport Dist. (1995) 39 Cal.App.4th 1017, 1027 [46 Cal.Rptr.2d 177].) (5) The City of West Hollywood's operation of automated traffic enforcement systems is *1329 authorized by law and generates revenue, and thus it is not "wasteful, improvident and completely unnecessary public spending." (Sundance v. Municipal Court (1986) 42 Cal.3d 1101, 1139 [232 Cal.Rptr. 814, 729 P.2d 80].) "[C]ourts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval." (Ibid.) A "taxpayer is not entitled to injunctive relief under Code of Civil Procedure section 526a where the real issue is a disagreement with the manner in which government has chosen to address a problem because a successful claim requires more than `an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion.'" (Coshow v. City of Escondido (2005) 132 Cal.App.4th 687, 714 [34 Cal.Rptr.3d 19].)[6]

B

Petition for Writ of Mandamus
(6) Code of Civil Procedure section 1086 provides that a writ of mandate "must be issued upon the verified petition of the party beneficially interested." "This provision has been held to establish a standing requirement the writ will issue only at the request of one who is beneficially interested in the subject matter of the action. [Citation.] [¶] To establish a beneficial interest, the petitioner must show he or she has some special interest to be served or some particular right to be preserved or protected through issuance of the writ." (Waste Management of Alameda County, Inc. v. County of Alameda, supra, 79 Cal.App.4th 1223, 1232.)
(7) The trial court determined plaintiffs in the Leonte action have no direct benefit in the issuance of a writ of mandate since they never received citations from the City of West Hollywood. Best claims he was not required to show any direct benefit, because citizens may obtain a writ of mandate *1330 based on public interest. Best cites the following from Green v. Obledo (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256]: "It is true that ordinarily the writ of mandate will be issued only to persons who are `beneficially interested.' (Code Civ. Proc., § 1086.) Yet in Bd. of Soc. Welfare v. County of L.A. (1945) 27 Cal.2d 98 [162 P.2d 627], this court recognized an exception to the general rule `"where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced."' [Citation.] The exception promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right." In Green v. Obledo, supra, 29 Cal.3d at page 145, the court held that plaintiff citizens had standing to seek writ relief pertaining to the proper calculation of benefits under the aid to families with dependent children program.
Here, the petition for writ of mandate alleged: "A writ of mandate should be issued directing [the city] to perform their [sic] public duties in accordance with the constitution and the laws of this state, and in particular: (1) to refund all fines, bail forfeitures and other assessments collected for illegal Automated Enforcement System citations to the payors; (2) to move to vacate each illegal Automated Enforcement System conviction in the appropriate court; (3) to report the vacation of the convictions to the [DMV] for withdrawal of `points,' (4) immediately and permanently to cease and desist illegally operating the Automated Enforcement System in the City of West Hollywood; and (5) to dismiss all pending prosecutions of the Automated Enforcement System."
Best submits the City of West Hollywood's red light photo program "is a question of public right because drivers and owners of registered vehicles passing through the [c]ity have received thousands of citations." Best made no showing, however, that the City of West Hollywood had any "clear, present duty" (Shamsian v. Department of Conservation (2006) 136 Cal.App.4th 621, 639 [39 Cal.Rptr.3d 62]) pertaining to items 1, 2, 3 and 5, listed above. To the contrary, the city was not and is not a party to criminal proceedings against red light runners, and thus cannot be ordered to perform. "The proceeding by which a party charged with a public offense is accused and brought to trial and punishment, is known as a criminal action." (Pen. Code, § 683.) "A criminal action is prosecuted in the name of the [P]eople of the State of California, as a party, against the person charged with the offense." (Pen. Code, § 684; see also Veh. Code, § 40000.1.)
*1331 Further, as to item 4, there is no indication the City of West Hollywood is illegally operating its automated traffic enforcement systems, as discussed above. Accordingly, summary judgment on the petition for writ of mandate was proper.[7]

II

Appeal in Glickman, C.L. Trustees, Cook and Buys Actions

A

General Legal Principles
Plaintiffs contend the court erred by finding for ACS, because the contingency fee contracts between it and the municipalities were void as against public policy and thus were predicates for UCL claims.
(8) Business and Professions Code section 17200 does not proscribe specific practices, but broadly prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." The UCL "governs `anti-competitive business practices' as well as injuries to consumers, and has as a major purpose `the preservation of fair business competition.' [Citations.] By proscribing `any unlawful' business practice, `section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) "`Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competitionacts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as `unfair' or `deceptive' even if not `unlawful' and vice versa."'" (Ibid.)
(9) "It is well established that our courts, like those of other states, may, in appropriate circumstances, void contracts on the basis of public policy. Of course `[t]he determination of public policy of states resides, first, with the people as expressed in their Constitution and, second, with the representatives of the peoplethe state Legislature.' [Citation.] ... `"[U]nless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. `The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, *1332 and ... should be exercised only in cases free from doubt.'"'" (City of Santa Barbara v. Superior Court (2007) 41 Cal.4th 747, 777, fn. 53 [62 Cal.Rptr.3d 527, 161 P.3d 1095], italics added.) "[A] contract should be construed to be valid and enforceable rather than void as against public policy." (Underground Constr. Co. v. Pacific Indemnity Co. (1975) 49 Cal.App.3d 62, 67 [122 Cal.Rptr. 330]; see Civ. Code, §§ 1643, 3541.)[8]
(10) The parties here agreed to the trial court's application of the following test of Wilhelm, supra, 18 Cal.App.2d at page 370, in determining whether the contingency fee contracts were void as against public policy: "`A contract by which one employs another to render services in looking up evidence that would establish a claim or which is to be used on a trial is recognized as valid, unless its tendency is to prevent or impede the due course of justice. The mere fact that the recovery of compensation is to be contingent upon the success of the suit is not sufficient to nullify the contract.'" (Italics added.)

B

Parol Evidence on ACS's Contract Performance
Plaintiffs contend the trial court violated the test of Wilhelm by "focus[ing] almost exclusively on whether the contracts, as a matter of fact, actually tainted or corrupted the prosecution of red light violations." (Boldface omitted.) Specifically, plaintiffs assert the court erred by relying on the lack of evidence of any disparity between the number of citations issued under ACS's contingency fee and flat fee contracts, as that issue goes to actual bias and was immaterial to whether the contingency fee contracts were void ab initio under the Wilhelm test.
We agree that the Wilhelm test is ordinarily applied as of the time of contracting, and not after performance. In Pelkey v. Hodge (1931) 112 Cal.App. 424, 426 [296 P. 908] (Pelkey), the court explained that when a contingency fee contract for testimony invites perjury, "`it will be declared void, although in the particular instance no injury to the public may have resulted. In other words its validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the *1333 public would result in the particular case. The test is the evil tendency of the contract and not its actual injury to the public in a particular instance.'" When possible, a contract is interpreted according to the plain language of the writing alone. (Ben-Zvi v. Edmar Co. (1995) 40 Cal.App.4th 468, 473 [47 Cal.Rptr.2d 12].)[9]
Plaintiffs, however, did not confine their case to the contract terms and any pertinent evidence concerning the formation of the contracts. Rather, plaintiffs urged the court to consider parol evidence pertaining to ACS's actual performance of the contingency fee contracts, in an effort to disparage ACS and show the evils of contingency fee contracts came to fruition here. Plaintiffs' theory was that a showing of actual bias also necessarily showed that from the outset the contracts tended to obstruct justice. Thus, the invited error doctrine precludes plaintiffs from successfully arguing on appeal that the court applied an incorrect standard by considering evidence of ACS's actual performance and supposed bias. (Giuliano v. Inland Empire Personnel, Inc. (2007) 149 Cal.App.4th 1276, 1290 [58 Cal.Rptr.3d 5].)
During opening remarks, plaintiffs' counsel stated the contingency fee contracts were void on their faces, and thus they were not required to show actual taint, but "[w]e ... want to go further" "to show that the reason for the rule against contingent fee contracts ... applies in this case." Plaintiffs asserted that "substantive harms ... resulted" from the contingency fee contracts, and "the contingent motivation colored and tainted everything ACS did in its actions." (Italics added.) Indeed, the lion's share of plaintiffs' case was designed to show ACS's corruption in the actual performance of the contingency fee contracts. ACS consistently objected to the evidence on relevancy grounds, to no avail.
Plaintiffs, for instance, called a former ACS employee to testify regarding the actual operation of the automated traffic enforcement systems, including such things as how she reviewed photographs; the average number of photographs she reviewed per day; how she obtained closeup photographs of license plate numbers and drivers' faces; how she determined, in accordance *1334 with each municipality's business rules, whether there were red light violations and, if so, whether the violations should be disregarded;[10] the percentage of photographs she recommended for citations; how she retrieved information from the DMV; and how she conducted the citation process. Over ACS's objection, plaintiffs argued the testimony was relevant because it "goes to the issue of the unreliability and the manner in which this was processed, because of the contingency fee, because money was issue number one, and the amount of work that was piled on."
Plaintiffs also put on evidence that in 2001, ACS discovered that four of eight red light cameras it installed in the City of Beverly Hills had incorrect time settings, and cited drivers were given refunds. Over ACS's objection, plaintiffs argued the evidence "speaks to the issue of the corrupting influence that these contracts and the contingent fee payment provision[s] have upon the operation of these cameras, because the cameras are only generating revenue when they're in operation. ACS is first and foremost concerned that they be clicking away 24 hours a day, seven days a week, 365 days a year. And here is an example where for approximately four and a half months ... four of eight cameras continued to operate when the operator, the technician, had failed to change the cameras to reflect daylight savings time." Plaintiffs argued the "contingent nature of the contracts provides the incentive to cheat, ... and that's what this speaks to," and "this is evidence of the ... multitude of concerns that arise and are engendered from including those provisions in the contract."
Additionally, plaintiffs adduced evidence that at an intersection in the County of Los Angeles, the yellow light lasted 3.5 seconds, but for a lengthy period ACS's camera took photos after 3 seconds on the yellow, or 0.5 second too soon. According to ACS, the County of Los Angeles caused the problem by changing the "red light phase that the County provided to ACS."
Further, plaintiffs produced evidence that after ACS and the City of Los Angeles contracted, they disagreed on the selection of certain intersections for the placement of red light cameras. Plaintiffs sought to show that because *1335 ACS's fees were contingent, it urged the City of Los Angeles to select intersections with high rates of red light violations as opposed to intersections with high accident rates. Plaintiffs argued ACS was wrongfully motivated by profit whereas the City of Los Angeles was motivated by safety concerns. Plaintiffs relied on a memorandum in which ACS wrote "the success of the program is centered around the per paid citation price of $60.00 and the selection or productive approaches. Productive approaches being defined as approaches that balance the public safety and revenue objectives of both the City [of Los Angeles] and [ACS]."
Again, over ACS's objection, the court allowed the evidence. The evidence also showed, however, that the City of Los Angeles gave ACS a list of approximately 800 intersections that had the highest accident rates, and directed ACS to choose 16 intersections from the list for the placement of red light cameras, to promote public safety. ACS studied approximately 150 intersections by using a videotape camera to show the average number of red lights run per hour. Ultimately, ACS acceded to the city's authority to select the intersections, and some of them had few red light violations.
Plaintiffs also elicited evidence that in San Diego, ACS relocated sensor loops in three intersections because "they were receiving interference from the street department's ... loops for the [traffic] lights," without first notifying the police department. ACS objected to this evidence as irrelevant to whether the contingency contracts were legal, and this time the court sustained the objection. However, when ACS later questioned a former ACS program manager about this issue, the court allowed the testimony. The witness explained that the loops in the three intersections were relocated farther into the intersections, and away from traffic signal loops, because "there was interference between the loops controlling the [c]ity's traffic signals and the loops that were with the red light camera." As a result, the cameras were locking up and taking no photos of violations. The witness explained she erred by not giving the police department prior notice, but ACS had obtained approval from the city's traffic engineering department.
In response to plaintiffs' case, ACS elicited testimony that the municipalities ultimately chose the intersections in which red light cameras were placed. For instance, the City and County of San Francisco independently selected intersections "based on where the most red light running caused crashes were happening, and resulting injuries." ACS's only input was whether the chosen intersections could accommodate automated traffic enforcement systems. ACS never refused to equip an intersection based on a projected lack of profitability. As ACS argued in closing, "ACS's goal to select sites where enough violations occurred to make the investment of the camera installation worthwhile is entirely consistent with the public safety goal of deterring red light running by catching people who engage in it."
*1336 Moreover, ACS established that the processing of red light violations did not differ under flat fee and contingency fee contracts. Also, ACS's payment to its employees, whether at the supervisory or lower levels, was the same whether the contracts ACS serviced were flat fee or contingency fee. Compensation and bonuses were not tied to the number of citations issued or paid, and ACS did not evaluate employees based on these criteria. ACS's director of engineering, who was responsible for the technological aspects of the automated traffic enforcement systems, testified he did not "get involved in pricing," and he was unaware of whether specific municipalities paid ACS on a flat fee or contingency fee basis. He said, "It didn't affect me. I didn't care about it."
Further, ACS established it set no quotas or targets for citations. Also, ACS did not assist police officers in their review of information ACS sent them, and ACS had no discretion or authority to determine which drivers would get citations. Additionally, ACS presented evidence that after expenses it lost money on the contingency fee contracts.
Now, rather astoundingly, plaintiffs ignore the nature of their evidence, and their protestations to the trial court that ACS's actual performance was relevant to the issue of whether the contingency fee contracts were void as against public policy from their inception. They assert the "applicable legal standard ... is not actual abuse, but the potential for abuse."[11] Their criticism of the court for going outside the four corners of the contracts is unfounded and unfair. If plaintiffs wanted the court's strict adherence to the Wilhelm test, and did not want the court to consider ACS's actual performance in determining whether the contingency fee contracts were void, they should not have submitted such evidence.
The ultimate test of whether the contingency fee contracts actually caused ACS to be corrupt, as plaintiffs alluded, was whether the number of citations under contingency fee and flat fee contracts differed. Certainly, the court properly relied on the lack of any such evidence. Further, the court properly relied on ACS's parol evidence, which also belied plaintiffs' claim of actual bias. Moreover, plaintiffs' evidence of isolated glitches in ACS's systems does not suggest any bias or taint associated with contingency fee contracts. As ACS argued in closing, "Human error ... is not a function of violator funded contracts. You can have human error under flat fee contracts." There was no evidence that ACS intentionally caused the problems to increase its revenue.

*1337 C

Contract Terms
In any event, the other factors on which the court relied are found in the contingency fee contracts themselves, or pertain to the negotiation of the contracts, and are not based on the lack of actual injury to the public. Plaintiffs' assertion that the court relied principally on parol evidence regarding actual bias is erroneous.[12]
Plaintiffs sought to show an inherent conflict in contingency fee contracts, because the municipalities were concerned with safety and as a private company ACS was concerned solely with profitability. ACS established, however, that in negotiations it wanted flat fee contracts as a better means of assuring profitability, but the municipalities insisted on contingency fee contracts or hybrid contracts with contingency fee components to limit financial risks and to give ACS incentive to perform in a timely and proper manner. There is no suggestion ACS took advantage of public agencies to obtain contingency fee arrangements.
Moreover, the contracts show the municipalities retained control over the selection of intersections for red light cameras. For instance, The City of Los Angeles's contract provided: "The 16 intersections and any subsequent intersections are to be selected by the city based on traffic safety needs. The contractor will review each of the intersections and concur with the selection. Any disagreements regarding locations of intersections will be resolved to the mutual satisfaction of the city and the contractor and to the furtherance of the program goal of increased traffic safety." (Some capitalization omitted.) The City of San Diego's contract provided: "The city, based on its own traffic safety criteria, will develop a list of possible sites" in conjunction with its police and transportation departments, and "[a]ll decisions concerning site selection shall vest with the city." (Some capitalization omitted.)
Plaintiffs also argued the contracts were illegal because they paid for ACS's procurement of evidence and testimony on a contingency fee basis, and ACS acted as a prosecutor. Plaintiffs argued that police officers "play[ed] more of a clerical role" than a law enforcement role.
In support of this theory, plaintiffs rely on several opinions. In Von Kesler v. Baker (1933) 131 Cal.App. 654 [21 P.2d 1017] (Von Kesler), the plaintiff *1338 (Baker) was a fruit and berry packer who placed his inventory in a cold storage facility. He alleged the facility was negligent and allowed the berries to ferment. Baker retained the defendant (Von Kesler), a fruit and berry broker who had represented Baker, to testify as an expert in Baker's actions against the storage facility, in exchange for 25 percent of any recovery Baker obtained. The court concluded that "Von Kesler, to the extent of his onefourth interest in any judgments to be procured in the cases, was practically made a party complainant in them in return for his services to be rendered as an expert witness. Such things cannot be. Here was too great a temptation to practice deceit and to commit the too common crime of perjury. The agreement was void as tending to obstruct and impair the administration of justice, and therefore as contrary to public policy." (Id. at p. 658.) Von Kesler distinguished between "[t]he ordinary witness ... testify[ing] to facts known to him," and expert witnesses who may "take the witness-stand in behalf of either party to an action who first comes forward to employ them," a "scandal" that "would be vastly enhanced if agreements like the one before us were permitted to stand." (Ibid.)
Pelkey, supra, 112 Cal.App. 424, was a demurrer case in which the complaints alleged the plaintiffs were witnesses to a will, they were called as witnesses at the trial of the contest of the will, and they had not received their witness fees. The plaintiffs requested their fees during jury deliberations, and the defendants offered the plaintiffs $10,000 contingent on the defendants' success in the litigation, in exchange for a waiver of witness fees, and the plaintiffs accepted. After the defendants prevailed, however, they paid the plaintiffs only $2,000. (Id. at p. 425.) Pelkey did not discuss the nature of the testimony. The court held the issue was not moot after the jury returned its verdict because of the possibility of a new trial or reversal on appeal. The court also held the agreement was invalid because it paid for witness testimony contingent on the success of the case, and thus "offer[ed] an inducement to perjury and tend[ed] to prevent the administration of justice." (Id. at p. 426.)
In People ex rel. Clancy v. Superior Court (1985) 39 Cal.3d 740 [218 Cal.Rptr. 24, 705 P.2d 347] (Clancy), a city hired an attorney to abate public nuisances under an ordinance that prohibited businesses that exclusively sold "`obscene publications.'" (Id. at p. 743.) The contract was to pay the attorney $60 per hour, reduced to $30 per hour for any suit the attorney brought that resulted in a final judgment against the city, and for any suit in which the city prevailed but did not obtain attorney fees. (Id. at p. 745.) The court found that under the circumstances there, the attorney's personal interest in the litigation violated the prosecutor's duty of neutrality, and thus he was disqualified from handling an abatement action against an adult bookstore. (Id. at pp. 746, 750.) The court noted that under appropriate *1339 circumstances, however, the government may engage private counsel on a contingency fee to try a civil case. (Id. at p. 748.)
Plaintiffs also cite Tumey v. Ohio (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437] (Tumey). In Tumey, the United States Supreme Court held that an Ohio law that allowed a village's mayor to preside over and decide trials of persons accused of unlawfully possessing liquor, violated the accused's constitutional rights because he was entitled to impartiality and the mayor had a pecuniary interest in the outcome of the case. A statute provided the mayor "`shall receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases.'" (Id. at p. 519.) The court noted that "no fees or costs in such cases are paid [the mayor] except by the defendant if convicted. There is, therefore, no way by which the [m]ayor may be paid for his service as judge, if he does not convict those who are brought before him; nor is there any fund from which marshals, inspectors and detectives can be paid for their services...." (Id. at p. 520.) The court also noted, however, that "[i]t is further said with truth that the [L]egislature of a [s]tate may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the [s]tate and the people." (Id. at p. 535.)
(11) The facts of the instant cases are readily distinguishable from the facts of Von Kesler, Pelkey, Clancy and Tumey. Further, those cases were issued long ago and they are vague on the standards applicable to determining whether a contingency fee contract has a tendency to obstruct justice. Although the cases contain broad language helpful to plaintiffs, we may not rely on it without considering the particular facts of the cases. "A decision is authority only for the point actually passed on by the court and directly involved in the case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (Gomes v. County of Mendocino (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93]; see Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd. (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)
Here, the contracts show that ACS did not act as a prosecutor. While ACS operated the systems and maintained the cameras, the municipalities' police departments were required to review all of ACS's work and make the final decisions on whether there was probable cause to issue citations. Further, ACS set the cameras, reviewed photographs and recommended citations based on the criteria set forth in each municipality's business rules. The business rules actually decreased the number of possible citations by requiring that no citation be issued in certain circumstances, such as in cases of right-hand turns or gender mismatch.
*1340 Further, in addition to being subject to police department review, ACS's work was also subject to court oversight in contested cases. While the contracts contemplated that ACS would provide expert witness testimony in contested cases, the testimony was limited to the technical operation and accuracy of the red light systems. The contracts did not require ACS to testify as to whether an accused ran a red light, as that testimony was left to law enforcement.
Moreover, there was no evidence that under the contract specifications ACS had any ability to increase revenue by manipulating its equipment to photograph drivers who entered intersections before the lights turned red. As the court held in Leonte I, supra, 123 Cal.App.4th 521, 528, the contract there showed as a matter of law that the City of West Hollywood retained the right to "control the functioning of the systems." Even if that were technically possible, however, it is unreasonable to presume ACS may do so. In the one intersection where photographs were accidentally taken 0.5 second early, ACS was required to return the fees it made on citations that were dismissed because of the error, even though the error was not its fault. Logically, whether the contracts were flat fee or contingency fee, ACS would have been motivated to operate its systems as accurately as possible to assure public agencies of their reliability, to obtain and retain business and to enhance its reputation.
We agree with the trial court that the contracts here did not tend "to prevent or impede the due course of justice." (Wilhelm, supra, 18 Cal.App.2d at p. 370.) ACS did have a financial interest in catching as many violators as possible, as did the municipalities, but that is not inherently sinister when the contracts gave the municipalities exclusive discretion to decide whether to issue citations and exclusive prosecutorial authority. The evils present in the Von Kesler, Pelkey, Clancy and Tumey cases are not present here, and thus they are inapplicable.
To the extent the judgment rests on the disputed factual matters plaintiffs raised, e.g., whether ACS's actual performance of the contracts showed abuse, and thus naturally showed a tendency for abuse, it is supported by substantial evidence. Further, the contract terms support the judgment as a matter of law.[13]

*1341 DISPOSITION
The judgment is affirmed. Defendants are entitled to costs on appeal.
Aaron, J., and Irion, J., concurred.
NOTES
[1] The following cases are involved in this coordinated action: Glickman v. ACS State and Local Solutions, Inc. (Super. Ct. San Diego County, No. GIC767025); C.L. Trustees v. Affiliated Computer Services, Inc. (Super. Ct. San Diego County, No. GIC773619); Cook v. ACS State & Local Solutions, Inc. (Super. Ct. San Diego County, No. GIC773950); Buys v. Affiliated Computer Services, Inc. (Super. Ct. S.F. City and County, No. 400669); and Leonte v. City of West Hollywood (Super. Ct. L.A. County, No. BC256915).
[2] The second amended complaint also named PRWT as a defendant, which was reportedly ACS's agent for administrating the contract there. We need not refer to PRWT separately, and include it in the ACS designation.
[3] The Leonte action originally included ACS as a defendant on the ground it violated the UCL by operating automated traffic enforcement systems in violation of former subdivision (a) (now subd. (c)) of section 21455.5 of the Vehicle Code, which provided, "Only a governmental agency, in cooperation with a law enforcement agency, may operate an automated enforcement system." (Stats. 2001, ch. 496, § 1.) The trial court had sustained without leave to amend a demurrer to the cause of action and dismissed ACS from the action. In October 2004 the Second District Court of Appeal affirmed the ruling in Leonte v. ACS State & Local Solutions, Inc. (2004) 123 Cal.App.4th 521 [19 Cal.Rptr.3d 879] (Leonte I). The court held ACS did not violate section 21455.5 of the Vehicle Code, as "the statutory purpose of authorizing the use of automated traffic enforcement systems is best served by a construction of `operate' that allows a governmental agency to hire private contractors to perform a broad range of functions," as long as an agency "retained the right to oversee and control the functioning of the system and thereby ultimately was the system operator." (123 Cal.App.4th at p. 527.) The trial court here then ruled that plaintiffs may not base their UCL claims against ACS on the issue raised in Leonte I because undisputed evidence showed the municipalities retained the right to oversee and control operation of the automated traffic enforcement systems.
[4] The historical and statutory notes accompanying the amended Vehicle Code section 21455.5 include a letter from Assemblymember Jenny Oropeza regarding the intent of Assembly Bill No. 1022 (2003-2004 Reg. Sess.) (Stats. 2003, ch. 511, § 1). The letter stated: "`With respect to litigation arising from existing law, AB 1022 is not intended to suggest or imply the legality or illegality with respect to any existing law, nor is it intended to imply that any contract based upon existing law is valid or invalid.'" (Historical and Statutory Notes, 66B West's Ann. Veh. Code (2008 supp.) foll. § 21455.5, p. 19.)
[5] Best violates basic principles of appellate practice by not developing any particular argument pertaining to his various "manner of operation" claims, by not citing any supporting legal authority, and by block citing to his summary judgment papers. "The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.) Accordingly, where a party provides a brief "without argument, citation of authority or record reference establishing that the points were made below," we may "treat the points as waived, or meritless, and pass them without further consideration." (Troensegaard v. Silvercrest Industries, Inc. (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].) We nonetheless address Best's points to the extent possible.
[6] Best contends that even if injunctive relief was unavailable because the City of West Hollywood no longer enters into contingency fee contracts for the operation of its automated traffic enforcement systems, he was entitled to a judicial declaration that former contingency fee contracts it had with ACS were illegal. He cites Van Atta v. Scott (1980) 27 Cal.3d 424, 449 [166 Cal.Rptr. 149, 613 P.2d 210], which explained that "taxpayer suits have not been limited to actions for injunctions. Rather, in furtherance of the policy of liberally construing [Code of Civil Procedure] section 526a to foster its remedial purpose, our courts have permitted taxpayer suits for declaratory relief, damages and mandamus." (Fns. omitted.) The purpose of a taxpayer waste cause of action is to restrain future illegal government conduct, but here, before the court entered summary judgment in the Leonte action, the Legislature expressly prohibited municipalities from entering into contingency fee contracts. (Veh. Code, § 21455.5, subd. (g)(1).) Thus, the equitable remedy of declaratory relief (Chee v. Amanda Goldt Property Management (2006) 143 Cal.App.4th 1360, 1380 [50 Cal.Rptr.3d 40]) would not serve to restrain future conduct and was unnecessary as the matter was moot.
[7] Best does not challenge the trial court's ruling as to the third amended complaint's additional causes of action.
[8] Witkin has explained: "Anything that has a tendency to injure the public welfare is, in principle, against public policy. But to determine what contracts fall into this vague class is exceedingly difficult. It has been frequently observed that the question is primarily for the Legislature, and that, in the absence of a legislative declaration, a court will be very reluctant to hold the contract void." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts § 452, p. 492.)
[9] Relevant parol evidence, however, is admissible when the legality of an agreement is in dispute. (Code Civ. Proc., § 1856, subd. (f); Pacific State Bank v. Greene (2003) 110 Cal.App.4th 375, 387 [1 Cal.Rptr.3d 739].) "Under California law, when fraud or illegality is alleged, the parol evidence rule does not apply, and evidence of pre-contract representations which vary or contradict the terms of an integrated contract are admissible." (Nagrampa v. MailCoups, Inc. (9th Cir. 2006) 469 F.3d 1257, 1291, italics added.) The parol evidence here, however, did not appear to vary or contradict the terms of the contingency fee contracts.
[10] Each municipality had business rules, which were ordinarily developed by its city attorney's office, the police department and the superior court. The rules concerned such issues as whether citations should be issued to drivers whose gender did not match that of the registered owner of the vehicle, to drivers of out-of-state vehicles, or to drivers turning right on a red light, and whether any grace period should be given drivers who entered intersections immediately after the lights turned red. The Vehicle Code allows an agency to issue a citation to the registered owner of a vehicle involved in a red light violation, even if he or she was obviously not the driver, if it establishes a procedure "whereby registered owners ... may execute an affidavit of nonliability if the registered owner identifies the person who was the driver of the vehicle at the time of the alleged violation and whereby the issuing agency issues a notice to appear to that person." (Veh. Code, § 40520, subd. (c).)
[11] In closing argument, plaintiffs again emphasized that while they could have relied solely on the contingency fee contracts, "we went beyond that. We ... actually proved how ... the taint from a contingent fee payment arrangement could enter into that system, and ... even did enter into that system." Plaintiffs argued that they produced evidence of "documented" abuses by ACS.
[12] Numerous contracts and amendments thereto between ACS and various municipalities were entered into evidence. Plaintiffs represented that substantively the contracts "are largely the same," and ACS did not disagree. Thus, we are not required to discuss each contract separately.
[13] ACS also contends the judgment must be affirmed because plaintiffs are barred from obtaining restitution from ACS of a portion of the fines they paid without first having their convictions overturned, they cannot establish causation since the municipalities issued the citations, ACS's performance under the contracts is protected by the litigation privilege, and the balancing of equities favors judgment in ACS's favor. Given our holding, we are not required to reach these interesting issues.