[L.A. No. 32041. Sept. 16, 1985.]

THE PEOPLE ex rel. JAMES J. CLANCY, as City Attorney, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
HELEN E. EBEL et al., Real Parties in Interest.

HELEN E. EBEL et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
THE PEOPLE ex rel. JAMES J. CLANCY, as City Attorney, etc., et al.,
Real Parties in Interest.

742

**COUNSEL**

James J. Clancy, City Attorney, for Petitioners and Real Parties in Interest People.

No appearance for Respondent.

Roger Jon Diamond and Hecht, Diamond & Greenfield for Petitioners and Real Parties in Interest Ebel.

OPINION

**MOSK, J.**—We evaluate the propriety of a contingent fee arrangement between a city government and a private attorney whom it hired to bring abatement actions under the city's nuisance ordinance. We hold the arrangement inappropriate under the circumstances, and in the interests of justice grant the extraordinary relief of disqualifying the attorney.

In 1981 Helen Ebel obtained a business license from petitioner City of Corona (City), and began operating a business known as the Book Store. The Book Store sells sexually explicit reading materials and provides an arcade section for viewing sexually explicit films. This action arises from the City's efforts to close the Book Store.

Within a few months after Ebel opened for business the City adopted two ordinances regulating adult bookstores, one defining "sex oriented material" and the other restricting the sale of such material to certain zones in the City. The city manager informed Ebel she would be compelled to move the Book Store because it was within 750 feet of a church that operated a school for minors. Ebel filed an action in federal court attacking the constitutionality of these ordinances. The circuit court of appeals directed entry of a preliminary injunction in her favor. (*Ebel* v. *City of Corona* (9th Cir. 1983) 698 F.2d 390.) The district court thereafter held the ordinances unconstitutional and granted a permanent injunction, and the judgment was affirmed on appeal. (*Ebel* v. *City of Corona* (9th Cir. 1985) 767 F.2d 635.)

Frustrated by its defeats in federal court on the constitutional issues, the City retained the services of Attorney James J. Clancy to abate nuisances under a new ordinance proposed on the same day. The ordinance defined a public nuisance as "Any and every place of business in the City . . . in which obscene publications constitute all of the stock in trade, or a principal part thereof . . . ."

Two weeks later the ordinance was passed. Following an investigation by the police department, the City adopted a resolution declaring the Book

Store to be a public nuisance and revoking its business license. A complaint was filed, on the relation of the City and Clancy as its "special attorney," against Ebel, her son Thomas Ebel, Eugene Van Zee, and the Book Store, for abatement of a public nuisance, declaratory judgment, and an injunction. Police officers were sent to the Book Store to photograph the magazines on sale and the movies available for viewing. The City then served a subpoena duces tecum on Timothy Groover, a clerk at the store.[1] The subpoena demanded that Groover (now, Thomas Ebel) appear in court and produce the 262 publications that the police had photographed, to permit the court to determine whether the publications are obscene.

The court allowed the City to amend its complaint by substituting "City Attorney of Corona" as Clancy's title in the action, and granted defendants' motion to prevent production of the magazines. The City petitions for writ of mandate to compel the court to vacate its order that Thomas Ebel need not bring the magazines to court, and to order Helen Ebel to produce the magazines. The Ebels cross-petition to compel the court to vacate its order denying defendants' motion to disqualify Clancy as attorney for the City, and its order permitting plaintiffs to amend the complaint. They also seek a writ of prohibition to bar the People from proceeding with Clancy instead of the regular City Attorney of Corona as its representative, and from permitting the City to proceed as a party.

## I. *Enforcement of the Subpoena Duces Tecum*

■ The parties hotly debate the issue whether the subpoena duces tecum, which orders Thomas Ebel to produce 262 magazines offered for sale at the Book Store, violates his privilege against self-incrimination.[2] Thomas Ebel is potentially subject to prosecution under Penal Code section 311.2, which prohibits the sale of obscene material. The parties agree that certain elements of the crime have been established by independent evidence (i.e., existence, possession, and authentication), and thus the act of producing the magazines is to that extent not "testimonial" and "incriminating." (See *Fisher* v. *United States* (1976) 425 U.S. 391, 408 [48 L.Ed.2d 39, 54, 96 S.Ct. 1569].) However, the parties disagree whether the element of scienter, which must be proved in order to convict, has been established by other evidence and whether it would be established by the act of gathering the magazines and bringing them into court.

---

[1]Groover was subsequently discharged. By stipulation the parties have deemed the subpoena to have been served on Thomas Ebel, currently a clerk at the Book Store.

[2]The City also seeks a writ to compel Helen Ebel to produce the magazines. But no subpoena was served on Helen Ebel, and this request was never presented to the trial court. In addition, since we conclude that Thomas Ebel may not claim the protection of the Fifth Amendment in this case, the issue is moot.

We need not reach this question. The Fifth Amendment cannot be "employed by an individual to avoid production of the records of an organization, which he holds in a representative capacity as custodian on behalf of the group. . . . '[T]he papers and effects which the privilege protects must be the property of the person claiming the privilege, or at least in his possession in a purely personal capacity.'" (*Bellis* v. *United States* (1974) 417 U.S. 85 [40 L.Ed.2d 678, 94 S.Ct. 2179].) This rule applies even if the evidence might incriminate the holder personally. (*Id.* at p. 88 [40 L.Ed.2d at p. 683].) The magazines named in the subpoena duces tecum are the property of the Book Store, an artificial entity that cannot claim the privilege against self-incrimination. (*Id.* at p. 90 [40 L.Ed.2d at p. 684].) Thomas Ebel has possession of the magazines only in his capacity as a clerk at the Book Store. He therefore cannot avoid compliance with the subpoena.

## II. *The Contingent Fee Arrangement*

The contract of employment between the City and Clancy contains a fee provision according to which Clancy is to be paid $60 per hour, "provided, however, that with respect to each and every suit undertaken by Attorney hereunder which results in a final judgment against CITY, said fee shall be reduced to $30.00 per hour . . . and provided further that said fee of $60.00 shall also be reduced to $30.00 per hour . . . in each and every suit undertaken by ATTORNEY hereunder in which CITY is a successful party if and to the extent that the CITY does not recover its attorney's fees from the unsuccessful party or parties."

The Ebels contend it is improper for an attorney representing the government to have a financial stake in the outcome of an action to abate a public nuisance. They maintain that a government attorney prosecuting such actions must be neutral, as must an attorney prosecuting a criminal case. Accordingly, we must first examine the requirement of neutrality imposed on government attorneys in certain cases, and then determine whether this requirement applies to attorneys prosecuting public nuisance actions.

At the outset we emphasize that the courts have authority to disqualify counsel when necessary in the furtherance of justice. (Code Civ. Proc., § 128, subd. (a)(5); *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1048 [197 Cal.Rptr. 232]; see also *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 261, fn. 4 [137 Cal.Rptr. 476, 561 P.2d 1164]; *People* v. *Municipal Court (Byars)* (1978) 77 Cal.App.3d 294, 298-299 [143 Cal.Rptr. 491].) Thus we may order that Clancy be dismissed from the case if we find the contingent fee arrangement prejudices the Ebels.

In *People* v. *Superior Court (Greer), supra,* 19 Cal.3d 255, we reviewed the responsibilities associated with the prosecution of a criminal case: ■ "The prosecutor is a public official vested with considerable discretionary power to decide what crimes are to be charged and how they are to be prosecuted. [Citations.] In all his activities, his duties are conditioned by the fact that he 'is the representative not of any [*sic*] ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " (*Id.* at p. 266, quoting *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) The American Bar Association's Code of Professional Responsibility elaborates on the public prosecutor's duty to seek justice: "This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all . . . ." (ABA Code of Prof. Responsibility, EC 7-13.)

Thus a prosecutor's duty of neutrality is born of two fundamental aspects of his employment. First, he is a representative of the sovereign; he must act with the impartiality required of those who govern. Second, he has the vast power of the government available to him; he must refrain from abusing that power by failing to act evenhandedly. ■ These duties are not limited to criminal prosecutors: "A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results." (*Id.,* EC 7-14.)

Not only is a government lawyer's neutrality essential to a fair outcome for the litigants in the case in which he is involved, it is essential to the proper function of the judicial process as a whole. Our system relies for its validity on the confidence of society; without a belief by the people that the system is just and impartial, the concept of the rule of law cannot survive. (See *id.,* EC 9-1, 9-2.)

■ When a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated. For this reason prosecutors and other government attorneys can be disqualified for having an interest in the case extraneous to their official function. For example, in *People* v. *Superior Court (Greer), supra,* 19 Cal.3d 255, we disqualified the prosecutor because a woman working in his office was the victim's

mother, was a material witness, and stood to gain custody of the victim's children if the defendant was convicted. In *Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], the United States Supreme Court outlawed a system whereby the mayor of a town served as judge in liquor possession cases in which the punishment was a fine. The money paid pursuant to the fine went into a fund from which the mayor could recover his costs for hearing the case. And in *Ward* v. *Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80], an Ohio statute authorizing mayors to sit in ordinance violation cases, the fines from which would go into the municipality's coffers, was held unconstitutional. "[T]he test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused . . . .'" (*Id.* at p. 60 [34 L.Ed.2d at p. 271], quoting, *Tumey, supra,* 273 U.S. at p. 532 [71 L.Ed. at p. 758]; see also *People* v. *Conner* (1983) 34 Cal.3d 141 [193 Cal.Rptr. 148, 666 P.2d 5] [conflict of interest where deputy district attorney was a witness to and arguably a victim of the criminal conduct being prosecuted by others in his office].)

■ A city attorney is a public official. (*People* ex rel. *Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 639 [107 P.2d 388].) The American Bar Association's Code of Professional Responsibility addresses the special considerations applicable to a lawyer who is also a public official: "A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties." (ABA Code of Prof. Responsibility, EC 8-8.) "[A]n attorney holding public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interests." (ABA Committee on Prof. Ethics, opn. No. 192 (1939); see also *People* v. *Conner, supra,* 34 Cal.3d 141, 146.)

■ It is true that the retainer agreement between the City and Clancy provides that Clancy is to be "an independent contractor and not an officer or employee of City." However, a lawyer cannot escape the heightened ethical requirements of one who performs governmental functions merely by declaring he is not a public official. The responsibility follows the job: if Clancy is performing tasks on behalf of and in the name of the government to which greater standards of neutrality apply, he must adhere to those standards.

In the case at bar, Clancy has an interest in the result of the case: his hourly rate will double if the City is successful in the litigation. Obviously

this arrangement gives him an interest extraneous to his official function in the actions he prosecutes on behalf of the City.

Contingent fee contracts for criminal prosecutors have been recognized to be unethical and potentially unconstitutional, but there is virtually no law on the subject. "[T]he contingent fee is generally considered to be prohibited [in] the prosecution and defense of criminal cases. However, there are so few cases, and these are predominantly old, that it is doubtful that there can be said to be any current law on the subject. Usually cited is a 1920 case from New Mexico in which the court refused to enforce a contingent fee contract calling for a larger fee if the defendant was convicted, for a lawyer assisting a prosecuting attorney. The court declared that the contingent element was against public policy because it tended to bring about conviction regardless of the prosecutor's primary duty to see that justice was done." (MacKinnon, Contingent Fees for Legal Services (1964) p. 52.) More strongly worded is the comment to standard 2.3(e) of the American Bar Association Standards Relating to the Prosecution Function: "It is clear that [case-by-case] fee systems of remuneration for prosecuting attorneys raise serious ethical and perhaps constitutional problems, are totally unacceptable under modern conditions, and should be abolished promptly."

The justification for the prohibition against contingent fees in criminal actions extends to certain civil cases. As discussed above, the rigorous ethical duties imposed on a criminal prosecutor also apply to government lawyers generally. "The county attorney is a county officer and as such is a representative of the people, although his duties relate only to civil matters." (ABA Committee on Prof. Ethics, opn. No. 186 (1938).)

Nothing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel. Certainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case. (See, e.g., *Denio* v. *City of Huntington Beach* (1943) 22 Cal.2d 580 [140 P.2d 392, 149 A.L.R. 320] [contingent fee arrangement whereby the city hired a law firm to represent it in all matters relating to the protection of its oil rights].) But just as certainly there is a class of civil actions that demands the representative of the government to be absolutely neutral. This requirement precludes the use in such cases of a contingent fee arrangement.

In *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860 [135 Cal.Rptr. 647, 558 P.2d 545], we held applicable to an eminent domain action the requirement that government attorneys be unaffected by personal interests: "Occupying a position analogous to a public prosecutor, [the government attorney] is 'possessed . . . of important governmental powers that are

pledged to the accomplishment of one objective only, that of impartial justice.' (*Professional Responsibility: Report of the Joint Conference* (1958) 44 A.B.A.J. 1159, 1218.) The duty of a government attorney in an eminent domain action, which has been characterized as 'a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner' [citation], is of high order." (*Id.* at p. 871.)

Similarly, the abatement of a public nuisance involves a balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes. And when an establishment such as an adult bookstore is the subject of the abatement action, something more is added to the balance: not only does the landowner have a First Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase. Thus, as with an eminent domain action, the abatement of a public nuisance involves a delicate weighing of values. Any financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated.

Public nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions. These actions are brought in the name of the People by the district attorney or city attorney. (Code Civ. Proc., § 731.)[3] A person who maintains or commits a public nuisance is guilty of a misdemeanor. (Pen. Code, § 372.) ▪ "A public or common nuisance . . . is a species of catch-all criminal offense, consisting of an interference with the rights of the community at large . . . . As in the case of other crimes, the normal remedy is in the hands of the state." (Prosser & Keeton, The Law of Torts (5th ed. 1984) p. 618; see also *Board of Supervisors* v. *Simpson* (1951) 36 Cal.2d 671, 672-675 [227 P.2d 14].) ▪ A suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney.[4]

---

[3]Clancy relies on an Indiana authority, *Sedelbauer* v. *State* (Ind.App. 1983) 455 N.E.2d 1159. In that case, however, the court approved the assistance of a private attorney only because he appeared "not in place of the State's duly authorized counsel." (*Id.* at p. 1164.)

[4]It appears that Attorney Clancy may have had little discretion in the decision whether to bring an action under the public nuisance ordinance; he does so at the direction of the city council. However, as we emphasized in the criminal arena, "the prosecutor's discretionary functions are not confined to the period before the filing of charges. . . . [W]hile the trial judge has the power to prevent actual prosecutorial misconduct in court, within those bounds the district attorney possesses the advocate's traditional ability to conduct his case in the manner he elects. [Citations.] A district attorney may thus prosecute vigorously, but both the accused and the public have a legitimate expectation that his zeal, as reflected in his tactics at trial, will be born of objective and impartial consideration of each individual case." (*People* v. *Superior Court (Greer), supra,* 19 Cal.3d 255, 267.)

Thus we hold that the contingent fee arrangement between the City and Clancy is antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance abatement action. ■■ ■■■ In the interests of justice, therefore, we must order Clancy disqualified from representing the City in the pending abatement action.[5]

Let a writ of mandate issue directing the court to vacate its order that Thomas Ebel need not produce the magazines listed in the subpoena, and issue a new order enforcing the subpoena and dismissing Clancy as the City's attorney in the pending action. In all other respects the petition is denied.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

The People's petition for a rehearing was denied November 20, 1985, and the opinion was modified to read as printed above.

---

[5]Code of Civil Procedure section 731 provides in part that "A civil action may be brought in the name of the people of the State of California to abate a public nuisance . . . by the district attorney of any county in which such nuisance exists, or by the city attorney of any town or city in which such nuisance exists . . . ." The Ebels maintain this provision makes it improper for the City instead of the state to bring this suit. But cities have long maintained public nuisance actions. (See *County of Sierra* v. *Butler* (1902) 136 Cal. 547 [69 P. 418].) In section 731 the Legislature meant to allow cities, as well as the state, to continue to bring such actions: the statute gives district attorneys and city attorneys the concurrent right to file such suits, and even provides that the city attorney "must bring" the action if directed to do so by the legislative authority of the city.

The Ebels argue further that section 731 makes it improper for Clancy instead of the official attorney of Corona to prosecute the action. The point may seem technical in this case, but could become crucial if a city council and its city attorney differed as to whether a nuisance action should be brought. Thus on remand the action herein should be brought in the name of Dallas Holmes, the Corona City Attorney. The City may hire Clancy to represent Holmes. (Gov. Code, § 37103.)