[No. G041338. Fourth Dist., Div. Three. Jan. 5, 2010.]

PRICELINE.COM INCORPORATED et al., Plaintiffs and Appellants, v. CITY OF ANAHEIM et al., Defendants and Respondents.

**1132**

**COUNSEL**

Skadden, Arps, Slate, Meagher & Flom, Darrel J. Hieber, Stacy R. Horth-Neubert, Daniel M. Rygorsky and Raoul D. Kennedy for Plaintiffs and Appellants Priceline.com Incorporated, Lowestfare.com LLC, and Travelweb LLC.

Kelly Hart & Hallman and Brian S. Stagner for Plaintiffs and Appellants Travelocity.com Inc., Travelocity.com LP, and Site59.com LLC.

Jones Day, Thomas R. Malcolm, James Karen and Travis Biffar for Plaintiffs and Appellants Hotels.com LP, Hotels.com GP LLC, Expedia, Inc., and Travelnow.com, Inc.

McDermott Will & Emery, Jeffrey A. Rossman and Elizabeth B. Herrington for Plaintiffs and Appellants Orbitz, Inc., Orbitz, LLC, Trip Network, Inc., and Internetwork Publishing Corporation.

Elizabeth Milito; Carlton DiSante & Freudenberger and Alison L. Tsao for the National Federation of Independent Business Small Business Legal Center as Amicus Curiae on behalf of Plaintiffs and Appellants.

Edward M. Teyssier for the Tax Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jana S. Leslie for Council on State Taxation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Cristina L. Talley, City Attorney, Moses W. Johnson, Assistant City Attorney; Kiesel, Boucher & Larson, Paul R. Kiesel, William L. Larson; Baron & Budd, Patrick J. O'Connell, Kevin D. McHargue, Laura J. Baughman; McKool Smith, Steven D. Wolens and Gary Cruciani for Defendants and Respondents.

Jennifer B. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**IKOLA, J.**—Plaintiffs[1] appeal from a judgment denying their petition for a writ of mandate directed to defendants the City of Anaheim, Mayor Curt Pringle, and City Attorney Jack White (collectively, Anaheim). Plaintiffs sought to compel Anaheim to litigate tax assessment proceedings without the assistance of outside counsel retained pursuant to a contingency fee agreement. They contend outside counsel's contingency fee arrangement violates a government lawyer's duty of neutrality. (See *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 746–750 [218 Cal.Rptr. 24, 705 P.2d 347] (*Clancy*).)

*Clancy* grants that "there are cases in which a government may hire an attorney on a contingent fee to try a civil case." (*Clancy, supra,* 39 Cal.3d at p. 748.) But *Clancy* bars contingency fee lawyers from being the government's representative in a vaguely defined "class of civil actions" (*ibid.*) that require "a balancing of interests" and "a delicate weighing of values" (*id.* at p. 749). The only California appellate case applying this restriction is *Clancy* itself, which barred a contingency fee lawyer from trying public nuisance actions as the city attorney. *Clancy* does *not* bar contingency fee lawyers from assisting government lawyers as cocounsel in ordinary civil litigation. This is such a case. The tax assessment proceeding is a civil administrative action that does not require "[the] delicate weighing of values" described in *Clancy*. We affirm the judgment denying plaintiffs' writ petition.

### FACTS

*The Taxes and the Contingency Fee Agreements*

Plaintiffs are "online travel companies that provide the service of facilitating the reservation of hotel rooms at hotels in the City, or are corporate

---

[1] Priceline.com Incorporated, Lowestfare.com LLC, Travelweb LLC, Travelocity.com Inc., Travelocity.com LP, Site59.com LLC, Hotels.com LP, Hotels.com GP LLC, Expedia, Inc., Travelnow.com, Inc., Orbitz, Inc., Orbitz, LLC, Trip Network, Inc., and Internetwork Publishing Corporation.

affiliates of such companies . . . ." Anaheim—through the law firm Kiesel, Boucher and Larson, LLP—informed plaintiffs in October 2007 they were liable for failing to remit transient occupancy taxes.

The transient occupancy tax is a local hotel tax. (Anaheim Mun. Code, § 2.12.000 et seq.) Every city hotel guest or other " '[t]ransient' " (*id.*, § 2.12.005.100) must "pay a tax in the amount of fifteen percent of the rent" "[f]or the privilege of occupancy of space in any hotel" (*id.*, § 2.12.010.010). Every hotel " '[o]perator' " (*id.*, § 2.12.005.050) shall "collect the tax . . . at the same time as the rent is collected from every transient" (*id.*, § 2.12.020.010) and remit the collected taxes to Anaheim each month (*id.*, § 2.12.030.010).[2]

Plaintiffs responded to the tax notice by asking Anaheim whether its outside counsel was serving on a contingency fee basis. Plaintiffs later asked for a copy of the retention agreement and followed with a formal request under the California Public Records Act. (Gov. Code, § 6250 et seq.)

Anaheim produced three retention agreements in March 2008. In the first agreement, dated April 2007, Anaheim retained Kiesel, Boucher and Larson, LLP, and Baron and Budd, P.C., as "Special Counsel to represent it in litigation seeking . . . relief for the non-payment or underpayment to the City of transient occupancy taxes by online booking companies . . . (collectively, the 'Litigation')." The law firms agreed to "obtain prior approval from the City concerning all substantive matters related to the Litigation including dispositive motions, selection of consultants and experts, and resolution of the Litigation. The City agrees to consult in good faith with Special Counsel prior to making a recommendation regarding any such substantive matter." Anaheim designated its city attorney "to direct Special Counsel . . . . This designation is intended to establish a clear line of authority and to minimize potential uncertainty . . . ."

The retention agreement provided for compensation "on a contingency fee basis." Outside counsel would receive 30 percent of any "Gross Recovery" and "[t]he sole contingency upon which the City [would] pay compensation to Special Counsel is a recovery and collection on behalf of the City, whether by settlement, arbitration award, Court judgment, or otherwise."

---

[2] An administrative hearing officer found plaintiffs liable for up to $9.8 million each in unremitted taxes, issuing a 55-page decision in February 2009. He found plaintiffs were "operators" of hotels and wrongly remitted taxes on the lower, wholesale rates they paid to reserve hotel rooms—not the higher, retail rates they charged customers. He rejected plaintiffs' assertion that Anaheim sought to impose the tax on their reservation fees. We express no opinion on the merits of this decision or Anaheim's tax assessments, over which litigation continues. We address only Anaheim's use of outside counsel.

The retention agreement contemplated legal challenges to the contingency fee agreement. It provided, "in the event that this contingency fee Agreement is found to be invalid, Special Counsel agrees to continue to represent the City in the Litigation with the understanding that, if there is no recovery, the City will owe nothing for attorneys' fees or Costs. [¶] If there is a recovery (including collection of the recovery), and this contingency fee Agreement is found to be invalid, the City shall pay a reasonable fee for the services rendered, plus Costs."

In the second agreement, dated October 2007, Anaheim retained Diamond McCarthy LLP as additional " 'Associate Counsel' " in the tax litigation. The agreement had similar terms regarding the scope of the representation and the relationship between Anaheim and outside counsel, though it now also specified that "[t]he City Attorney, as the chief legal officer for the City, is charged with representing the City in legal proceedings with respect to which it has an interest." Its contingency fee provisions mirrored those in the first agreement. The third retention agreement provided for fee sharing among the three law firms acting as outside counsel.

Anaheim issued estimated tax assessments to plaintiffs in May 2008, which plaintiffs appealed by requesting an administrative hearing.[3] Plaintiffs challenged the propriety of the contingency fee agreements in their hearing request and subsequent filings with the hearing officer. The administrative hearing officer ruled he lacked jurisdiction to consider Anaheim's contingency fee arrangement with outside counsel.

*The Writ Proceedings*

Plaintiffs petitioned for a writ of mandate directing Anaheim "to immediately cease and desist using Contingency Fee Counsel in the administration and enforcement of the City's transient occupancy tax."[4] They asserted

---

[3] The Anaheim Municipal Code sets forth a comprehensive administrative procedure to be followed if an operator fails to remit the proper tax, which provides for assessments, appeals, and civil actions. (Anaheim Mun. Code, §§ 2.12.060.010, 2.12.060.020, 2.12.090.) The code generally provides that any code violation may be prosecuted as a misdemeanor unless otherwise expressly provided. (*Id.*, § 1.01.370.) Nothing in the record suggests the City has or will institute criminal prosecutions against plaintiffs.

[4] Anaheim unpersuasively contends on appeal the writ petition was untimely. We see no prejudicial delay. (See *San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 605 [51 Cal.Rptr.2d 897] ["Laches bars a mandamus action if the petitioner delays in initiating or prosecuting an action, and prejudice to the respondent results."].) Plaintiffs filed their petition in September 2008, only six months after they obtained the retention agreements and one month after the hearing officer declined to address the contingency fee arrangement.

Anaheim violated its " 'duty of neutrality' by involving persons in the tax enforcement and collection process that have a financial interest in the outcome."

Plaintiffs offered a declaration from their counsel. Plaintiffs' counsel stated, "Contingency Fee Counsel has represented and acted for the City in every aspect of the Anaheim administrative appeal hearing process. Contingency Fee Counsel have handled all communications and negotiations with [plaintiff online travel companies] regarding those proceedings, prepared and submitted all briefing to the Hearing Officer, made legal argument for the City at the hearings, made all evidentiary objections for the City, cross-examined all witnesses for the City, and has been the City's exclusive mouthpiece at the hearings for its legal positions and issues. During four days of testimony, resulting in a 1,200 page transcript, the record reflects that the City's in-house counsel spoke no more than eleven times, and each time for the sole purpose of scheduling access of the City's hearing room."

Plaintiffs' counsel further stated Anaheim's auditor manager, Susan Grabemeyer-Grande, "admits under oath . . . Contingency Fee Counsel's retained outside expert, Econ One, calculated the estimated assessment for each [plaintiff online travel company], and her role as to the estimated assessments was essentially limited to checking Econ One's math."

Plaintiffs also offered the auditor manager's declaration from a separate hotel tax class action. (*Transient Occupancy Tax Cases* (Super. Ct. L.A. County, JCCP No. 4472).) She stated "that [her] office would estimate the tax due by the [online travel companies] by using the best information available to [her]." Based on the plaintiffs' tax payments and data obtained by an Anaheim consultant, EconOne, she "determined that a valid estimate of the amounts due by each [online travel company] could be calculated by using a nine-step process using [this] information . . . ." She allowed EconOne to perform these calculations, but "instructed [her] Senior Management Auditors to review the calculations of EconOne to insure that such calculations were accurate and done pursuant to the typical and normal methodology used by [her] office."

Anaheim opposed the petition, offering a new declaration from the auditor manager. She stated, "I and my staff directed the methodology and calculations of the assessments on the [online travel companies] to ensure compliance with Chapter 2.12 of the Anaheim Municipal Code and consistency with Anaheim's past audit practices. EconOne provided assistance and their expertise with the [online travel companies'] data file and prepared the initial assessment schedule. I and my staff then recalculated and verified the

calculations, ensured compliance with the Ordinance and performed sample testing of the data submitted by the [online travel companies] to hotel records."

Anaheim also offered a declaration from Assistant City Attorney Moses W. Johnson IV. He explained that "[i]n November 2003, employees of the City . . . advised the City to . . . collect the full amount of [the transient occupancy tax] on rooms rented online. The City made a decision to collect these taxes from the [online travel companies] well before retaining outside counsel in April 2007."

The assistant city attorney described his role in overseeing the tax assessment proceedings. He stated the city attorney "assigned me to be the attorney from the City of Anaheim's City Attorney's Department to oversee, supervise and control the assessment process, administrative proceedings and any subsequent litigation that the City of Anaheim was preparing to commence against the [online travel companies]." In "carrying out the charge to oversee, supervise, and control the assessment, administrative and litigation processes and procedures relative to the City of Anaheim's claims against the [online travel companies] for outstanding [transient occupancy tax] interest and penalties, I have performed the following functions: [¶] a. participated in and overseen virtually all substantive discussions by and among city personnel and Outside Counsel; [¶] b. participated in, overseen and approved all substantive decisions concerning the City of Anaheim's claims against the [online travel companies] and have overseen and approved the subsequent implementation of those substantive decisions by Outside Counsel; [¶] c. reviewed and approved virtually all written communications and documents submitted to the [online travel companies], the [online travel companies'] counsel, the administrative Hearing Officer and the courts by Outside Counsel." He continued, "To perform these functions, constant communication between me and Outside Counsel has occurred, usually on a daily basis. There have been dozens of conference calls, which usually occur several times per week. . . . Outside Counsel may not, and have not, engaged in any substantive actions or decisions without my direction, oversight and approval. My direction, oversight, and approval has been present from the beginning and continues on a daily basis."

After a hearing, the court denied the petition. It found, "the facts of the instant action are distinctly different from *Clancy*," which "must be strictly construed." It entered judgment accordingly.

## DISCUSSION

■ "[T]he courts have authority to disqualify counsel when necessary in the furtherance of justice." (*Clancy, supra,* 39 Cal.3d at p. 745.) Contrary to

Anaheim's claim on appeal, the writ petition was an appropriate method to seek the disqualification of outside counsel. An appeal from the hearing officer's decision would be an inadequate remedy for violation of the duty of neutrality.[5] (See *Clancy*, at pp. 744, 750 [issuing writ of mandate disqualifying counsel].) We turn now to that duty.

*The* Clancy *Case*

Plaintiffs contend *Clancy* imposes a duty on Anaheim to be "absolutely neutral" in the tax assessment proceedings (*Clancy, supra*, 39 Cal.3d at p. 748), and that this duty bars Anaheim from retaining outside counsel in those proceedings on a contingency fee basis. But *Clancy* grants that "there are cases in which a government may hire an attorney on a contingent fee to try a civil case." (*Ibid.*) Thus, there is considerable tension in *Clancy*'s holding.

■ This tension requires careful analysis of *Clancy*, not casual citation to its most sweeping rhetoric. The "language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 [95 Cal.Rptr.2d 198, 997 P.2d 511] [limiting factually inapt Cal. Supreme Court precedent].)

In *Clancy*, the City of Corona retained a private lawyer, James Clancy, to prosecute public nuisance abatement actions against businesses selling obscene publications. (*Clancy, supra*, 39 Cal.3d at p. 743.) The retention agreement provided Clancy was an independent contractor to be paid $60 per hour if the city won and recovered attorney fees, or $30 per hour otherwise. (*Id.* at pp. 745, 747.) Acting as the city's " 'special attorney,' " Clancy filed a complaint against a bookstore and its operator. (*Id.* at p. 744.) The trial court denied the defendants' request to disqualify Clancy. (*Ibid.*)

On review, the *Clancy* court issued a writ of mandate "dismissing Clancy as the City's attorney in the pending action." (*Clancy, supra*, 39 Cal.3d at p. 750.) Its analysis began by "review[ing] the responsibilities associated with the prosecution of a criminal case" and the prosecutor's " 'considerable discretionary power to decide what crimes are to be charged and how they are to be prosecuted.' " (*Id.* at p. 746.) From its review, *Clancy* concluded a

---

[5] Because plaintiffs limited their writ petition to challenging the use of outside counsel in the tax assessment proceeding, not the propriety of the tax itself, they are excused from the " 'pay first, litigate later' " doctrine in this case. (*Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1135 [113 Cal.Rptr.2d 690] [requiring taxpayers "to pay an assessed tax before filing a refund action"].) We express no opinion on the applicability of this doctrine in an appeal from the hearing officer's decision or any other related litigation.

criminal prosecutor has a "duty of neutrality." (*Ibid.*) It later noted, "[c]ontingent fee contracts for criminal prosecutors have been recognized to be unethical and potentially unconstitutional, but there is virtually no law on the subject." (*Id.* at p. 748.) Lacking other authority, the court relied on a textbook citing an unnamed 1920 New Mexico case and an American Bar Association standard. (*Ibid.*)

*Clancy* used the criminal prosecutor's duty of neutrality as a starting point. Relying on an American Bar Association code, it stated, "These duties are not limited to criminal prosecutors: 'A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results.' " (*Clancy, supra,* 39 Cal.3d at p. 746.) It further stated, "When a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated. For this reason prosecutors and other government attorneys can be disqualified for having an interest in the case extraneous to their official function." (*Ibid.*) Each of the four cases cited in support of this proposition involved judges or criminal prosecutors—not "other government attorneys."[6] (*Clancy,* at pp. 746–747.)

*Clancy* did cite an eminent domain case for the proposition that government lawyers must be "unaffected by personal interests." (*Clancy, supra,* 39 Cal.3d at p. 748, citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871 [135 Cal.Rptr. 647, 558 P.2d 545] (*Decker*).) It noted, " 'The duty of a government attorney in an eminent domain action, which has been characterized as "a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner" [citation], is of high order.' " (*Clancy, supra,* 39 Cal.3d at p. 749.) But *Decker* did not involve contingency fee lawyers. In that case, the city attorney committed misconduct by denying that the highest and best use of the condemned parcel would be offsite airport parking—even though he knew the city intended to use the parcel to fill just that need. (*Decker,* at pp. 865–866, 870–871.) *Decker* criticized the city's failure to " 'develop a full and fair record' " and its breach of "responsibility to arrive at just compensation." (*Id.* at p. 871.)

---

[6] Two of the cases disqualified criminal prosecutors because witnesses worked in their offices (*People v. Conner* (1983) 34 Cal.3d 141 [193 Cal.Rptr. 148, 666 P.2d 5] (*Conner*); *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164] (*Greer*), superseded by statute as stated in *Conner,* at p. 147) and two disqualified mayors from presiding over cases in which they or their city would recover any fines (*Ward v. Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80] (*Ward*); *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437] (*Tumey*)). (See *Clancy, supra,* 39 Cal.3d at pp. 746–747.)

*Clancy* likened public nuisance cases to eminent domain cases on the ground that "[s]imilarly, the abatement of a public nuisance involves a balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes. And when an establishment such as an adult bookstore is the subject of the abatement action, something more is added to the balance: not only does the landowner have a First Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase. Thus, as with an eminent domain action, the abatement of a public nuisance involves a delicate weighing of values. Any financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated." (*Clancy, supra*, 39 Cal.3d at p. 749.)

*Clancy* also likened public nuisance cases to criminal prosecutions. "Public nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions. These actions are brought in the name of the People by the district attorney or city attorney. [Citation.] A person who maintains or commits a public nuisance is guilty of a misdemeanor. [Citation.] 'A public or common nuisance . . . is a species of catch-all criminal offense, consisting of an interference with the rights of the community at large . . . . As in the case of other crimes, the normal remedy is in the hands of the state.' [Citations.] A suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney." (*Clancy, supra*, 39 Cal.3d at p. 749, fn. omitted.)

In a footnote, *Clancy* took pains to distinguish a case that "approved the assistance of a private attorney only because he appeared 'not in place of the State's duly authorized counsel.' " (*Clancy, supra*, 39 Cal.3d at p. 749, fn. 3, citing *Sedelbauer v. State* (Ind.Ct.App. 1983) 455 N.E.2d 1159, 1164 (*Sedelbauer*).) In the following footnote, it noted that even if "Clancy may have had little discretion in the decision whether to bring an action," " 'the prosecutor's discretionary functions' " continue through trial. (*Clancy*, at p. 749, fn. 4.)

Finally, *Clancy* reached its holding. "Thus we hold that the contingent fee arrangement between the City and Clancy is antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance abatement action." (*Clancy, supra*, 39 Cal.3d at p. 750.)

## The Reach of Clancy's Holding Is Limited

*Clancy* does not bar governmental entities from retaining outside counsel on a contingency fee basis in all actions. *Clancy* conceded the government may retain private lawyers to litigate certain civil actions, even on a contingency fee basis. "Nothing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel. Certainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case." (*Clancy, supra*, 39 Cal.3d at p. 748.) It cited a case involving a "contingent fee arrangement whereby the city hired a law firm to represent it in all matters relating to the protection of its oil rights." (*Ibid.*, citing *Denio v. City of Huntington Beach* (1943) 22 Cal.2d 580 [140 P.2d 392] (*Denio*), overruled on a different ground in *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792 [100 Cal.Rptr. 385, 494 P.2d 9].)

More recent cases have endorsed government retention of outside counsel on a contingency fee basis. One California court affirmed a writ of mandate directing a city to pay its outside counsel's contingency fee, holding the arrangement comported with municipal debt limitations. (*Law Offices of Cary S. Lapidus v. City of Wasco* (2004) 114 Cal.App.4th 1361, 1370 [8 Cal.Rptr.3d 680] (*Lapidus*).) Another California court affirmed a judgment awarding contingency fees to a city attorney, holding the arrangement complied with statutes barring public officials from having personal financial interests in official decisions or contracts. (*Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533, 540 [49 Cal.Rptr.2d 676] (*Campagna*).) The duty of neutrality was not addressed in either case. Still, it would appear California governments have routinely retained contingency fee counsel for decades, before and after *Clancy*.

We decline to extend *Clancy*'s reach beyond the two limitations of its holding implied by its facts. "[T]he positive authority of a decision is coextensive only with" "the facts presented by the case." (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1097.)

First, *Clancy* does not bar the use of contingency fee lawyers in all civil litigation. This limitation is shown by *Clancy*'s (1) concession that "[c]ertainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case" (*Clancy, supra*, 39 Cal.3d at p. 748); (2) its statement that the duty of absolute neutrality applies only to "a class of civil actions," not to all civil actions (*ibid.*); and (3) its comparison of public nuisance actions with eminent domain actions, which involve " ' "a sober inquiry into values," ' " "a balancing of interests" and "a delicate weighing of values" (*id.* at p. 749).

Second, even in that class of actions where *Clancy* otherwise applies, it does not bar contingency fee lawyers from assisting government lawyers as cocounsel. This limitation is shown by (1) the starting point of *Clancy*'s analysis—the focus on a criminal prosecutor's " 'considerable discretionary power to decide what crimes are to be charged and how they are to be prosecuted' " (*Clancy, supra,* 39 Cal.3d at p. 746); (2) the reminder that the prosecutor's discretionary functions continue past the filing decision and into the trial tactics (*id.* at p. 749, fn. 4); and (3) the footnote distinguishing the *Sedelbauer* case on the ground the "private attorney . . . appeared 'not in place of the State's duly authorized counsel' "[7] (*Clancy,* at p. 749, fn. 3). When contingency fee lawyers assist government lawyers as cocounsel, the "considerable discretionary power" that *Clancy* seeks to protect remains vested in the government lawyers. The government lawyers check the contingency fee lawyer's financial interests.

Other courts have recognized the same two limitations.

One federal district court in California denied a motion to disqualify contingency fee lawyers from a tort action, finding the "case is sufficiently distinguishable from *Clancy* to allow for the government's retention of private counsel." (*City and County of San Francisco v. Philip Morris, Inc.* (N.D.Cal. 1997) 957 F.Supp. 1130, 1135.) It noted outside counsel "is acting here as co-counsel, with plaintiffs' respective government attorneys retaining full control over the course of the litigation. Because plaintiffs' public counsel are actually directing this litigation, the Court finds that the concerns expressed in *Clancy* regarding overzealousness on the part of private counsel have been adequately addressed . . . ." (*Ibid.*) It further noted, "This lawsuit . . . does not raise concerns analogous to those in the public nuisance or eminent domain contexts discussed in *Clancy*" and "the case as it stands now will not require the private attorneys to argue about . . . policy choices or value judgments . . . ." (*Ibid.*)

Another federal district court in California found *Clancy* did not require disqualification of contingency fee lawyers because "Defendants have not countered Plaintiff's showing that the City Attorney for the City of Grass Valley is acting as co-counsel in this action and the City retains 'ultimate

---

[7] The private attorney in *Sedelbauer* was not retained on a contingency fee basis, as far as the opinion discloses. (*Sedelbauer, supra,* 455 N.E.2d at p. 1164 [allowing "Citizens for Decency" member to assist in obscenity prosecution].) Plaintiffs claim this fact weighs against allowing contingency fee counsel to act as cocounsel. Actually, it cuts the other way. *Clancy* could have distinguished *Sedelbauer* on the ground no contingency fee was involved. Instead, *Clancy* took the trouble to distinguish *Sedelbauer* on the ground the private lawyer acted as cocounsel. This extra step in the analysis suggests *Clancy* was embracing the arrangement in *Sedelbauer* as a counterpoint to the arrangement in *Clancy*.

decision-making authority in the case.' " (*City of Grass Valley v. Newmont Mining Corp.* (E.D.Cal., Nov. 20, 2007, No. 2:04-cv-00149-GEB-DAD) 2007 WL 4166238.)

The Supreme Court of Rhode Island distinguished *Clancy* and allowed contingency fee lawyers to act as cocounsel in a public nuisance action. (*State v. Lead Industries Assn., Inc.* (R.I. 2008) 951 A.2d 428.) It held, "there is nothing unconstitutional or illegal or inappropriate in a contractual relationship whereby the Attorney General hires outside attorneys on a contingent fee basis to assist in the litigation of certain *non-criminal* matters. Indeed, it is our view that the ability of the Attorney General to enter into such contractual relationships may well, in some circumstances, lead to results that will be beneficial to society—results which otherwise might not have been attainable. However, due to the special duty of attorneys general to 'seek justice' and their wide discretion with respect to same, such contractual relationships must be accompanied by exacting limitations. In short, it is our view that the Attorney General is not precluded from engaging private counsel pursuant to a contingent fee agreement in order to assist in certain civil litigation, so long as the Office of Attorney General retains *absolute and total control over all critical decision-making* in any case in which such agreements have been entered into." (*Id.* at p. 475, fns. omitted, boldface omitted.)

The Maryland high court similarly allowed contingency fee lawyers to assist government lawyers in a tort action. (*Philip Morris Inc. v. Glendening* (1998) 349 Md. 660 [709 A.2d 1230].) It distinguished *Clancy* because "there are no constitutional or criminal violations directly implicated here, and, hence, there is no potential conflict of interest." (*Phillip Morris, supra,* 709 A.2d at pp. 1242–1243.) It noted the *Clancy* arrangement did not provide for "the oversight of an elected State official." (*Phillip Morris,* at p. 1243.) In contrast, the retention agreement there entrusted to the Attorney General " 'the authority to control all aspects of [outside counsel's] handling of the litigation,' . . . whose 'authority shall be final, sole and unreviewable.' " (*Ibid.*)

These cases bolster our confidence we have read *Clancy* carefully and faithfully, as we must.[8] (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) *Clancy* bars governments from granting sole litigation discretion to contingency fee lawyers in public nuisance actions—and perhaps to other actions requiring delicate

---

[8] The two-page opinion in *Sears, Roebuck and Co. v. Parsons* (1991) 260 Ga. 824 [401 S.E.2d 4, 5], is unpersuasive. There, the court found Georgia public policy forbade a county from paying contingency fees to an outside auditor that reviewed property tax returns for potential undervaluations. (*Ibid.*) California public policy on the use of contingency fee counsel is set forth in *Clancy.*

balancing and weighing of interests and values. Only those cases fall within the class of civil actions wherein the duty of absolute neutrality bars contingency fees.

Clancy *Allows the City Attorney to Receive Assistance from Contingency Fee Cocounsel in the Tax Assessment Proceedings*

*Clancy*'s twin limitations render it inapplicable here.

First, outside counsel do not act as Anaheim's sole representatives in the tax assessment proceedings. Both contingency fee retention agreements designate the city attorney "to direct Special Counsel and . . . establish a clear line of authority and to minimize potential uncertainty . . . ." The second agreement clarifies that "[t]he City Attorney, as the chief legal officer for the City, is charged with representing the City in legal proceedings with respect to which it has an interest." Under both agreements, the city attorney must give "prior approval" to the law firms, after "consult[ing] in good faith," for "all substantive matters related to the Litigation . . . ."

In practice, the city attorney actively exercises his supervisory authority over the tax assessment proceedings. The city attorney designated an assistant city attorney "to oversee, supervise and control the assessment process, administrative proceedings and any subsequent litigation that the City of Anaheim was preparing to commence against the [online travel companies]." The assistant city attorney stated he had "participated in and overseen virtually all substantive discussions by and among city personnel and Outside Counsel"; "participated in, overseen and approved all substantive decisions concerning the City of Anaheim's claims against the [online travel companies] and have overseen and approved the subsequent implementation of those substantive decisions by Outside Counsel"; and "reviewed and approved virtually all written communications and documents submitted to the [online travel companies], the [online travel companies'] counsel, the administrative Hearing Officer and the courts by Outside Counsel." He has "constant communication" with the law firms, "usually on a daily basis," and has engaged in "dozens of conference calls [with them], which usually occur several times per week." He stated the law firms "may not, and have not, engaged in any substantive actions or decisions without my direction, oversight and approval." This constant, direct oversight by the city attorney's office distinguishes this case from *Clancy*, in which a single contingency fee lawyer served as the sole "special attorney" for the city in the public nuisance action. (*Clancy, supra*, 39 Cal.3d at p. 744.)

Plaintiffs do not offer evidence contradicting the assistant city attorney's attestation to his active, constant supervision of this litigation. The declaration

from their counsel addresses outside counsel's litigation conduct, before and during the hearing, but it does not speak to the city attorney's oversight and approval of those actions. The declarations from the auditor manager do not support plaintiffs' characterization that the City's role in issuing the "estimated assessments was essentially limited to checking Econ One's math." Read fairly, the declarations show the auditor manager "determined that a valid estimate of the amounts due by each [online travel company] could be calculated by using a nine-step process" and "directed the methodology and calculations of the assessments" before turning to EconOne to perform the initial calculations using its data and expertise. In any event, EconOne is not a contingency fee law firm. *Clancy* is silent on the retention of experts.

■ Second, this is a civil, administrative proceeding. It is not a criminal prosecution, for which "[c]ontingent fee contracts . . . have been recognized to be unethical and potentially unconstitutional . . . ." (*Clancy, supra,* 39 Cal.3d at p. 748.) Nor does a tax assessment proceeding fall within the "class of civil actions that demands the representative of the government to be absolutely neutral." (*Ibid.*) That class included public nuisance actions because they require "a balancing of interests," and "a delicate weighing of values." (*Id.* at p. 749.)

■ This civil tax assessment proceeding requires no notable balancing or weighing of interests or values. Unlike a public nuisance case, it does not require Anaheim to balance a party's use of its property against Anaheim's competing interests in abating dangerous or obnoxious conditions. Unlike an eminent domain case, it does not require Anaheim to balance a party's ownership of property against Anaheim's interest in taking the property for public use.

All that this action requires is a determination that the transient occupancy tax is due. To be sure, Anaheim must construe its municipal code to determine whether the tax is due, and decide whether to pursue its collection. But these are the unremarkable precursors to any civil litigation brought by a government entity—not the balancing of interests and weighing of values contemplated by *Clancy*. For Anaheim to sue for breach of contract, for example, it would go through substantially the same process: construe the contract to determine whether it has a claim, and decide whether to pursue that claim.[9] In every civil action, the government makes a discretionary determination that it should assert a valid claim. (Cf. *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1558 [92 Cal.Rptr.3d 219] [governmental entities' discretion whether to pursue claims cannot be

---

[9] Plaintiffs claim the power to tax is the power to destroy. In the context of *Clancy*, little distinction exists between the civil tax assessment proceeding and any civil action in which a government entity is a plaintiff asserting a legal claim for money due.

enjoined by mandate].) Extending *Clancy* to this tax assessment proceeding simply because it requires some exercise of legal analysis (is the tax owed?)[10] and discretion (should suit be filed?) would logically entail *Clancy*'s expansion into breach of contract actions and any civil action requiring these same decisions—actions in which government entities appear to employ contingency fee counsel routinely. (See *Denio, supra,* 22 Cal.2d 580; *Lapidus, supra,* 114 Cal.App.4th at p. 1370; *Campagna, supra,* 42 Cal.App.4th at p. 540.)

In 24 years, no California appellate court has extended *Clancy*'s reach to civil actions generally—or to any action other than one for public nuisance.[11] No sound reason exists why *Clancy* would bar government lawyers from receiving assistance from contingency fee lawyers as cocounsel in this case.

*Cases Involving Prosecutors and Judges Do Not Warrant Disqualification Here*

Plaintiffs contend *Clancy* should be extended to this case, even if not to all civil actions, because a tax assessment proceeding is "analogous" to a criminal prosecution. Plaintiffs rely heavily on language from California cases addressing the potential conflicts of interest of criminal prosecutors.[12] (See *People v. Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310] (*Eubanks*); *Conner, supra,* 34 Cal.3d 141; *Greer, supra,* 19 Cal.3d 255; *People v. Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363].) *Clancy,* too, drew some of its broadest language from cases involving criminal prosecutors. (*Clancy, supra,* 39 Cal.3d at pp. 746–747, citing *Conner, supra,* 34 Cal.3d 141, *Greer, supra,* 19 Cal.3d 255.)

If anything, California law governing prosecutor recusal suggests outside counsel should not be disqualified here. Penal Code section 1424 supersedes cases like *Greer, supra,* 19 Cal.2d at page 269, which required recusal for the mere appearance of impropriety. (See *Conner, supra,* 34 Cal.3d at p. 147.) The statute sets forth "a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a 'conflict' exists whenever there is a 'reasonable possibility that

---

[10] We need not determine whether our analysis would apply to a hypothetical tax statute that explicitly requires a balancing of interests or weighing of values—not just legal analysis—in order to determine whether the tax is owed in the first place.

[11] The California Supreme Court has granted review of a case in which the court declined to disqualify contingency fee cocounsel in a public nuisance case. (*County of Santa Clara v. Superior Court* (2008) 161 Cal.App.4th 1140 [74 Cal.Rptr.3d 842], review granted July 23, 2008, S163681.) We deny as irrelevant plaintiffs' request for judicial notice of an amicus curiae brief filed in that case by the California District Attorneys Association.

[12] Petitioners inaptly cite *Berger v. United States* (1935) 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629], a prosecutorial misconduct case involving no alleged conflict of interest.

the DA's office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment.' " (*Eubanks, supra,* 14 Cal.4th at p. 594.) "[T]he potential for prejudice to the defendant—the likelihood that the defendant will not receive a fair trial—must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness." (*Id.* at p. 592.)

Thus, plaintiffs' concern that the contingency fee arrangement creates the appearance of impropriety would be unavailing to recuse a criminal prosecutor. Plaintiffs would have to show both a conflict and a likelihood of unfair treatment at the hands of outside counsel—which they have not done. And the trial court's decision not to disqualify outside counsel would be reviewed for an abuse of discretion. (*Eubanks, supra,* 14 Cal.4th at p. 592.) On this record we would find none. It would be anomalous for us to disqualify outside counsel from a civil tax assessment proceeding when, on the same record, we would not recuse them from a criminal prosecution.

Plaintiffs also rely upon a non-California case that disqualified an attorney from a criminal prosecution. (*Young v. U. S. ex rel. Vuitton et Fils S. A.* (1987) 481 U.S. 787 [95 L.Ed.2d 740, 107 S.Ct. 2124] (*Young*).) Using its supervisory power,[13] the court disqualified lawyers—whose client had obtained an injunction barring certain defendants from engaging in trademark infringement—from accepting a court appointment to prosecute criminal contempt charges against those defendants for violating the injunction. (481 U.S. at pp. 790–792, 809.) It held, "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." (*Id.* at p. 809.) It noted the appointment "at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." (*Id.* at p. 806.) And it placed counsel in the untenable position of owing conflicting duties to both the government and their client. (*Id.* at p. 807.)

*Young* does not support disqualification here. It did not address civil litigation. Moreover, *Young* endorsed having private lawyers assist criminal prosecutors. It acknowledged "the fact that counsel for the beneficiary of the court order may often be most familiar with the allegedly contumacious conduct," and suggested "[t]hat familiarity may be put to use in *assisting* a disinterested prosecutor in pursuing the contempt action . . . ." (*Young, supra,* 481 U.S. at p. 806, fn. 17.)

Plaintiffs further contend Anaheim's use of contingency fee counsel violates their right to due process. The due process cases they rely upon involve

---

[13] "Federal rules based on the supervisory power of the United States Supreme Court over the administration of justice in the federal courts . . . are not binding on the states." (*People v. Thayer* (1965) 63 Cal.2d 635, 639 [47 Cal.Rptr. 780, 408 P.2d 108].)

judges or other adjudicators, not civil litigators. (See *Ward, supra*, 409 U.S. 57 [mayor received compensation from fines levied in cases he adjudicated]; *Tumey, supra*, 273 U.S. 510 [town collected fines from cases adjudicated by mayor]; *Caperton v. A. T. Massey Coal Co., Inc.* (2009) 556 U.S. ___ [173 L.Ed.2d 1208, 129 S.Ct. 2252] [judge should have recused himself from hearing case involving $3 million campaign contributor]; *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813 [89 L.Ed.2d 823, 106 S.Ct. 1580] [state justice cannot hear insurance case that would set legal standard governing his pending bad faith case against insurer]; *Gibson v. Berryhill* (1973) 411 U.S. 564 [36 L.Ed.2d 488, 93 S.Ct. 1689] [optometry board disqualified from license revocation hearing involving competing optometrists sued by the board]; *In re Murchison* (1955) 349 U.S. 133, 134 [99 L.Ed. 942, 75 S.Ct. 623] [same judge who hears secret testimony as " 'one-man judge-grand jury' " cannot adjudicate ensuing contempt charge].)

Cases regarding judges are wholly inapt from cases involving criminal prosecutors—and all the more from cases involving civil litigation. "The rigid requirements of *Tumey* and *Ward*, designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." (*Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 248 [64 L.Ed.2d 182, 100 S.Ct. 1610] [reversing decision to disqualify administrative prosecutor because his department received share of fines].) To the contrary, "[p]rosecutors need not be entirely 'neutral and detached' [citation]. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law." (*Ibid.*) Indeed, "a state legislature 'may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the State and the people.' "[14] (446 U.S. at p. 249.) If so, outside counsel may be similarly "reward[ed] for thus acting in the interest of [Anaheim] and the people." (*Ibid.*)

*A Final Thought*

Although we have shaped our analysis to conform to *Clancy* and the parties' arguments, we are troubled by the notion that lawyers are more apt to treat defendants unfairly if they are paid pursuant to a contingency fee

---

[14] *Marshall* held using civil penalties collected for violations of federal child labor laws to reimburse the prosecuting agency did not violate due process. (*Marshall v. Jerrico, Inc., supra*, 446 U.S. at pp. 241, 252.) It declined to "say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function" (*id.* at p. 250), though it cautioned, "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." (*Id.* at pp. 249–250.) Nothing in *Marshall* suggests it was contemplating the use of contingency fee lawyers as cocounsel in civil litigation.

agreement, rather than an hourly fee agreement. *Clancy* identifies the contingency fee lawyers' financial interest in the outcome of a case as a factor that may interfere with the duty of neutrality. But it is just as easily argued that a contingency fee lawyer is *less* likely to pursue meritless litigation, whereas an hourly fee lawyer may have a financial motivation to continue prosecuting litigation discovered to lack merit. In short, we question the unstated assumption upon which *Clancy* is based. But we are constrained to analyze this case under the rationale stated therein. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.)

## DISPOSITION

The judgment is affirmed. Anaheim shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.